Jerold J. MACKENZIE, Plaintiff-Respondent-Cross-Appellant,†

v.

MILLER BREWING COMPANY and Robert L. Smith, Defendants-Appellants-Cross-Respondents,

Patricia G. BEST, Defendant-Cross-Respondent.

Court of Appeals

*No. 97–3542. Oral argument August 18, 1999.—Decided February 22, 2000.*

2000 WI App 48

(Also reported in 608 N.W.2d 331.)

†Petition to review granted.

1

3

4

5

7

8

On behalf of the defendants-appellants-cross-respondents and the defendant-cross-respondent, the cause was submitted on the briefs of *Mary Pat Ninneman, John A. Casey* and *Frank J. Daily* of *Quarles & Brady,* of Milwaukee. There was oral argument by *John A. Casey* and *Frank J. Daily.*

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Michael A. I. Whitcomb* of *Michael A. I. Whitcomb, S.C.,* of Milwaukee, and *Gerald P. Boyle* of *Boyle, Boyle & Smith, S.C.,* of Milwaukee. There was oral argument by *Michael A. I. Whitcomb* and *Gerald P. Boyle.*

A nonparty brief was filed by *Patrick O. Dunphy* and *Mark L. Thomsen* of *Cannon & Dunphy, S.C.,* of Brookfield, for Wisconsin Academy of Trial Lawyers.

A nonparty brief was filed by *Donald L. Heaney* and *Kenneth B. Axe* of *Lathrop & Clark,* of Madison, for Wisconsin Manufacturers and Commerce.

A nonparty brief was filed by *Lisa M. Bergersen* of *Lindner & Marsack, S.C.,* of Milwaukee, for Human Resources Management Association.

A nonparty brief was filed by *Lisa C. Paul* of *Croen & Barr, LLP,* of Milwaukee, and *Janet L. Heins* of *Heins Law Office LLC,* of Mequon, for Wisconsin Employment Lawyers Association.

A nonparty brief was filed by *Dennis R. McBride,* of Milwaukee, for Equal Employment Opportunity Commission, and *C. Gregory Stewart, Philip B. Sklover, Lorraine C. Davis,* and *Robert J. Gregory,* of Washington, D.C., for U.S. Equal Employment Opportunity Commission.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. After years of litigation, including a three week jury trial, this case comes here with a record of more than ten thousand pages, briefs from the parties totaling more than three hundred pages, and *amicus curiae* briefs from: the Human Resources Management Association, the Wisconsin Academy of Trial Lawyers, the Wisconsin Employment Lawyers Association, Wisconsin Manufacturers and Commerce, and the United States Equal Employment Opportunity Commission. The issues are many and the arguments, at times, are intricate. In this decision, we concentrate on the most significant, dispositive issues. We do so, however, only after carefully considering the entire record, all the briefs, the oral arguments to this court,[1] and the supplemental letter briefs following oral argument.

---

[1] As the parties have learned, this court's tape recording system malfunctioned at oral argument. Fortunately, however, we were able to obtain a nearly complete recording of the arguments from WTMJ News, whose reporter was covering the case. Thus, with appreciation to WTMJ, we have been able to review the oral arguments.

## I. INTRODUCTION—STATUS ON APPEAL AND CROSS-APPEAL

¶ 2. The Miller Brewing Company and Robert L. Smith (collectively, "Miller") appeal from the judgment, following a jury trial, awarding Jerold J. Mackenzie more than twenty-five million dollars for what he alleged was intentional misrepresentation leading him to continue his employment at Miller Brewing. Miller argues that, under established legal principles, as most recently reiterated in *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 579 N.W.2d 217 (1998)—a case decided subsequent to the trial court litigation in the instant case—Mackenzie's claims could not be maintained in tort and, even if they could, Mackenzie failed to prove any of the elements of intentional misrepresentation. Miller also argues that Mackenzie failed to establish any basis for the jury's award of punitive damages and, even if he did, the punitive damages were excessive.

¶ 3. We need not consider Miller's several substantial arguments challenging the punitive damages because, we conclude, under *Tatge*, Mackenzie's claim for intentional misrepresentation was not actionable in tort. Further, we conclude that even if *Tatge* does not preclude Mackenzie's claim as a matter of law, Mackenzie failed to prove: that Miller misrepresented or concealed anything it had a duty to disclose; that Miller intended to deceive him; that he relied on any alleged misrepresentation; or that he was financially damaged as a result of misrepresentation. Accordingly, on the primary issues on which Miller appeals, we reverse.

¶ 4. Miller also appeals from the judgment against Smith, following the same jury trial, awarding Mackenzie $100,000 for tortious interference with a prospective contract, resulting from what Mackenzie

alleged was Smith's effort to prevent him from being promoted. Miller argues that Smith's conduct—commenting on why he believed Mackenzie should not be promoted—was privileged and, further, that regardless of any arguable privilege, Mackenzie failed to prove any interference. Miller is correct and, therefore, we also reverse the judgment against Smith.

¶ 5. Mackenzie cross-appeals from two trial court orders. He presents several arguments challenging the trial court's conclusion that the jury's award of $1,500,000 punitive damages against Patricia G. Best, a Miller Brewing employee, for tortious interference with his employment relationship, could not be sustained because the jury failed to award compensatory damages against Best. Mackenzie contends that, given what he views as the undisputed evidence of compensatory damages caused by Best, the trial court should have changed the jury's answer on compensatory damages to conform to the proof. Alternatively, he contends that the inconsistency of the compensatory and punitive damages verdicts requires a new trial on the issue of compensatory damages against Best.

¶ 6. Additionally, and alternatively, Mackenzie maintains that, given the overlapping evidence supporting his claims against Miller and Best, and under the trial court's jury instruction on punitive damages regarding his claim against Best, the compensatory damages the jury awarded *against Miller Brewing and Smith* support the punitive damages the jury awarded *against Best*. Finally, Mackenzie maintains that even if, generally, punitive damages cannot stand in the absence of compensatory damages, an exception should exist to allow punitive damages here because of the "inherently damaging" nature of a false complaint of sexual harassment.

¶ 7. Concluding that Mackenzie's recoveries against Miller Brewing and Smith must be reversed, we have left him without *any* compensatory damages *against Miller Brewing, Smith, or Best*. Thus, even if Mackenzie's arguments about the interplay of the Miller/Best compensatory/punitive damages verdicts otherwise could have prevailed, the absence of *any* compensatory damages precludes the punitive damage award against Best. Therefore, we need not address all of Mackenzie's arguments challenging the trial court's decision regarding the punitive damages verdict against Best; some of them simply are not viable given our reversal of the judgments against Miller Brewing and Smith. Nevertheless, a number of Mackenzie's intriguing theories survive and still must be addressed. For reasons we will explain, we reject them also and, therefore, on this aspect of Mackenzie's cross-appeal, we affirm the dismissal of the claim against Best.

¶ 8. Mackenzie also cross-appeals from the trial court's order, granting partial summary judgment to Miller, dismissing his claim for wrongful termination. He argues that even though he was an "at-will" employee, Miller Brewing could not terminate him based on allegations of sexual harassment because, he maintains, public policy precludes the dismissal of an employee unless the sexual harassment allegations are substantiated. We conclude, however, that Mackenzie failed to establish that he would fall within the public policy exception for termination of "at-will" employees articulated in *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573, 335 N.W.2d 834 (1983) ("A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. . . . An employee cannot be fired for refusing to violate the

constitution or a statute."). Indeed, he failed to even allege that he was "discharged for refusing to violate a constitutional or statutory provision," *see Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 141, 396 N.W.2d 167 (1986), or that he was terminated for complying with a "fundamental and well-defined" legal duty, *see Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 669, 571 N.W.2d 393 (1997). Thus, partial summary judgment was appropriate and, therefore, on this aspect of the cross-appeal, we also affirm.

## II. FACTUAL BACKGROUND

¶ 9. Although many additional facts will emerge in our discussion of each issue, a brief synopsis will help to frame this appeal and cross-appeal.

¶ 10. Mackenzie worked for Miller Brewing from 1974 until his termination in 1993. Moving up the corporate ladder of what were termed "grade level" positions, he relocated to Milwaukee for a second time in 1982 when he was promoted to a grade level 14 position. In 1987, he held a grade level 14 position under the supervision of Robert Smith.

¶ 11. In October 1987, Miller Brewing, in the course of reorganizing various aspects of its distribution and sales services, hired William Glickert who became Mackenzie's immediate supervisor and took over many of his responsibilities. As a result, Mackenzie asked Smith whether the reorganization affected his (Mackenzie's) grade level. Mackenzie testified that Smith assured him that his grade level 14 status was unaffected by the reorganization. Smith acknowledged that such a conversation may well have occurred and that he would have so advised Mackenzie because, in fact, the reorganization had not altered Mackenzie's grade level, salary, or benefits.

14

¶ 12. In May 1989, Miller Brewing evaluated the grade levels of hundreds of employees. As a result, certain job classifications were assigned a higher grade level, others a lower one, and still others were left unchanged. Ultimately, 835 employees were in job classifications assigned lower grade levels. Mackenzie was one of them. He and these other employees were not "downgraded," however, because the reclassifications were prospective, taking effect only upon the hiring of successors. The current employees were "grandfathered," thus retaining their grade levels, salaries and benefits. Mackenzie remained at grade level 14.

¶ 13. In August 1989, Mackenzie received a memorandum informing him of the reclassifications of positions under his supervision. He did not, however, receive any communication informing him that his position was among the many others that had been downgraded. And he did not ask. Mackenzie testified that he did not inquire whether his position had been reevaluated because he "didn't see any need" to do so. He explained, "[I]f I would have been affected I would think that Mr. Smith would have advised me."

¶ 14. In August 1992, Miller Brewing decided to modify the "grandfathered" status of employees who had remained in job classifications that had been downgraded in 1989. Thus, in an August 17, 1992 memo, Mackenzie was informed that, effective January 1, 1993, he would be reduced to grade level 13—the grade level to which his position had been reclassified in 1989. Mackenzie, however, despite being downgraded to grade level 13, was to retain his salary and benefits, except that he no longer would be eligible for the stock option program.

15

¶ 15. During the period encompassing Mackenzie's intentional misrepresentation claim—from November 1987 when some of Mackenzie's responsibilities shifted to Glickert, to January 1993 when Mackenzie's status shifted to grade level 13—two other events occurred that, at trial, came to be intertwined with each other and with the misrepresentation claim.

¶ 16. First, in 1989 and 1990, Mackenzie's secretary, Linda Braun, complained, first to Miller personnel and, later, in an equal rights legal action, that Mackenzie had sexually harassed her. Mackenzie testified that he denied most of Braun's allegations and, when informed that Miller Brewing had settled Braun's claim for $16,000, said: "I'm sorry you settled. I didn't do anything." Smith, however, testified that Mackenzie "admitted that his behavior had been inappropriate." And Smith testified that he warned Mackenzie that any repetition of such conduct would result in termination; Mackenzie testified that he did not recall any such warning.

¶ 17. Second, in October 1992, a Miller Brewing task force studying the performance of its distributors recommended the creation of a new department in the sales division, the establishment of which would have substantially reduced Smith's responsibilities. When Smith learned that Mackenzie, who had served on the task force, was being considered for the position of director of the new department, he advised Tom Koehler, Vice-President of Sales, and Tom Cardella, the leader of the task force, of what he deemed to be Mackenzie's management deficiencies. Smith recommended that the new directorship go to another individual—the one who ultimately received the appointment.

16

¶ 18. Finally, later, a third event, ultimately leading to Mackenzie's termination, played prominently in the trial and, even more prominently, in the media reports of what came to be known as "the Seinfeld case." In March 1993, Patricia Best, a Miller distributor services manager who had previously been under Mackenzie's supervision, reported that Mackenzie had engaged her in inappropriate conversations about an episode of the *Seinfeld* television show. She said she was offended when Mackenzie commented on and later continued to discuss the show's thinly veiled references to female sexual anatomy. Miller Brewing investigated her report and, shortly thereafter, fired Mackenzie for "poor management judgment."

¶ 19. After he was fired, Mackenzie brought four claims: (1) intentional misrepresentation against Miller Brewing and Smith for failing to inform him that his position had been downgraded, and for representing that his grade level had not been affected by the 1987 reorganization; (2) tortious interference with a prospective contract against Smith for opposing his promotion to the new directorship; (3) tortious interference with contract against Best for "fraudulently misrepresenting" feeling harassed by their communication regarding the *Seinfeld* episode; and (4) wrongful termination, in violation of public policy, against Miller Brewing for firing him in response to Best's report.

¶ 20. Granting Miller Brewing partial summary judgment, the trial court dismissed with prejudice Mackenzie's wrongful termination claim. The other claims, however, proceeded to trial and the jury returned verdicts: (1) finding that Miller Brewing and Smith intentionally made misrepresentations to Mackenzie, and awarding, against Miller Brewing, $6,501,500 compensatory and $18,000,000 punitive

17

damages, and against Smith, $1500 compensatory and $500,000 punitive damages (later reduced by the trial court to $100,000, which Mackenzie accepted); (2) finding that Smith intentionally interfered with Mackenzie's promotion, and awarding $100,000 compensatory damages; and (3) finding that Best intentionally interfered with Mackenzie's contract, and awarding $0 compensatory damages and $1,500,000 punitive damages (later set aside by the trial court).

## MILLER'S APPEAL

### I. INTENTIONAL MISREPRESENTATION

#### A. *Tatge* AND THE DUTY TO DISCLOSE

¶ 21. Mackenzie's intentional misrepresentation claim presented two theories: (1) that in 1987 Miller *misinformed* him that the reorganization did not affect his status; and (2) that in 1989 Miller *failed to inform* him that his position had been downgraded.[2] Whether a cause of action flowing from an employment relationship is actionable in tort for misrepresentation presents a question of law. *See Tatge*, 219 Wis. 2d at 105. We decide questions of law independently of the trial court's determinations. *See Gloudeman v. City of St. Francis*, 143 Wis. 2d 780, 784, 422 N.W.2d 864 (Ct. App. 1988).

---

[2] Neither at trial nor on appeal have Mackenzie's theories drawn any legally significant distinction between misinforming and failing to inform. Therefore, although in other circumstances such possible distinctions could be significant, in this case, for the most part, we will simply use the term "misrepresentation" to encompass both of Mackenzie's theories and the conduct he alleged—misinforming, and failing to inform/concealing information.

18

¶ 22. Miller, relying on *Tatge*, first argues that "[a]s a matter of law, neither Miller [Brewing Company] nor Smith can be liable for intentional misrepresentation for the alleged 1987 misrepresentation as to Mackenzie's job status or for not disclosing to Mackenzie that the grade level of his job classification had been changed in 1989."[3] Miller is correct.

---

[3] Preliminarily, we note that Miller vigorously challenges the trial court's postverdict motion determination that Miller had stipulated that it had a legal duty to disclose, therefore waiving the very issue that has become the primary issue on appeal. Nor does Mackenzie embrace the trial court's conclusion; he never contends that Miller stipulated that it had such a duty. Mackenzie does argue, however, that Miller "stipulated that the jury should decide this very point." The record, however, refutes both the trial court and Mackenzie.

Miller consistently argued that, as a matter of law, because it had no duty to disclose, Mackenzie's misrepresentation claim must be dismissed. Having failed to prevail on that point, however, Miller participated in the preparation of the jury instructions. But Miller did so without ever abandoning its argument. For example, at the instructions conference, counsel for Miller stated:

> I believe that plaintiff's claim against Miller and Smith for failure to disclose a fact requires first a finding that there is a duty to disclose, and although after the court rejected our request that the court decide this as a matter of law, I think it then became necessary to have a question in the special verdict with respect to duty to disclose.

Throughout the instructions conference, Miller's counsel continued to make the same point, sometimes referring to the trial court's rejection of its motion for summary judgment. Ultimately, Miller stipulated to the question: "[D]id Miller Brewing Company have a duty to disclose the fact that Mackenzie's position was downgraded to a Grade Level 13, and that he was grandfathered at Grade Level 14?" Clearly, however, Miller

¶ 23. In *Tatge*, Tatge, an "at-will" employee, had objected to the non-disclosure/non-compete provisions of a "management agreement" that modified his job duties and compensation arrangements. *See Tatge*, 219 Wis. 2d at 102–03. He refused to sign the agreement only after being assured that his refusal would not affect his employment. *See id.* at 103. Ultimately, however, he was fired for refusing to sign. *See id.* He brought several claims against his employer and, in a jury trial, prevailed on his tort claim of negligent misrepresentation. *See id.* at 104–05. On post-verdict motions, however, the trial court dismissed his claim. *See id.* at 105. Tatge appealed, challenging not only the dismissal of the negligent misrepresentation claim, but also the trial court's dismissal, on summary judgment, of his wrongful discharge claim. *See id.* at 101, 105. This court affirmed, concluding that "a breach of an employment contract is not actionable in tort." *Id.* at 105 (quoting *Tatge v. Chambers & Owen, Inc.*, 210 Wis. 2d 51, 53, 565 N.W.2d 150 (Ct. App. 1997)).

¶ 24. Appealing this court's decision, Tatge contended that the supreme court should "address his misrepresentation claim under tort law—not as a wrongful discharge or breach of contract claim under contract law." *Id.* at 107. As the supreme court explained, Tatge "advocate[d] this approach by arguing that employers have an independent duty to their employees to refrain from misrepresentation." *Id.* The

neither waived its primary challenge nor agreed that the issue was for the jury to decide. *See Milwaukee & Suburban Transp. Corp. v. Milwaukee County*, 82 Wis. 2d 420, 442, 263 N.W.2d 503 (1978) ("stipulation should not be construed so as to effect the waiver of a right not plainly intended to be relinquished").

supreme court, however, refused to take that approach. Rejecting Tatge's argument, the court declared, "We decline to give our blessing to such an irreverent marriage of tort and contract law." *Id.* The court reiterated that there " 'must be a duty existing independently of the performance of the contract for a cause of action in tort to exist.' " *Id.* (quoting *Landwehr v. Citizens Trust Co.*, 110 Wis. 2d 716, 723, 329 N.W.2d 411 (1983)).

¶ 25. Therefore, as Miller argues, it would seem that *Tatge* precludes Mackenzie's intentional misrepresentation claim. After all, the supreme court explicitly rejected the proposition that, exclusive of the employment contract, "employers have an independent duty to their employees to refrain from misrepresentation." *Id.* Mackenzie argues, however, that the supreme court's rejection of that proposition was based on the fact that Tatge's tort claim of negligent misrepresentation was connected to his contract claim of wrongful termination. He points out that, in *Tatge*, the supreme court stated that, under *Brockmeyer*, "any claim which is *dependent upon a wrongful termination* from at-will employment is not actionable in tort." *Tatge*, 219 Wis. 2d at 108 n.3 (emphasis added). Moreover, in *Tatge*, the supreme court declared, "Because it is *tied inextricably to his termination* from employment, [the plaintiff's] misrepresentation claim was properly dismissed by the circuit court." *Id.* at 108 (emphasis added). And, finally, the supreme court distinguished a case in which "the alleged misrepresentation was not dependent upon a breach of [the employees'] employment contract." *Id.* at 109 n.5.

█

¶ 26. Thus, Mackenzie contends, *Tatge* does not preclude his intentional misrepresentation claim. After all, he reminds us, his tort claim derives not from

breach of contract/employment *termination*, but from employment *continuation*. So, he argues, *Tatge*, by repeatedly emphasizing the inextricable connection between Tatge's tort and contract claims, offers implicit support for the proposition that where tort and contract claims are separate, both survive. We conclude, however, that although these *Tatge* passages, standing alone, could support Mackenzie's theory, when read in full context they do not save his claim. We hold that *Tatge* precludes an employee's tort claim against an employer for alleged intentional misrepresentation that allegedly induced *continuation* of employment.

¶ 27. Although the supreme court emphasized that, in *Tatge*, the misrepresentation *was* connected to the plaintiff's termination, it did not otherwise qualify its explicit rejection of the proposition that "employers have an independent duty to their employees to refrain from misrepresentation." *Id.* at 107. Emphatically, and almost as if to anticipate Mackenzie's argument, the supreme court clarified, "We do not mean to suggest that litigants may circumvent the holding of this court simply by pleading damages which somehow do not arise solely from one's termination of employment." *Id.* at 108 n.4. And although, obviously, employment *termination* is distinguishable from employment *continuation*, each tort claim connects to an employment contract. That is, whether, as in *Tatge*, an employee is claiming that negligent misrepresentation caused the *termination* of employment, or, as in the instant case, that intentional misrepresentation caused the *continuation* of employment, each "misrepresentation claim finds its lifeline in the improper performance of an employment contract." *Id.* at 107.

22

¶ 28. Thus, while in some respects Mackenzie's claim for intentional misrepresentation may be viewed independently of his claims for wrongful discharge, tortious interference with prospective contract, and tortious interference with contract, the independence of his misrepresentation claim is not as absolute as Mackenzie suggests. In fact, in the trial court, Miller, not Mackenzie, vigorously argued for severance of the three claims surviving summary judgment and, on appeal, continues to argue that the trial court improperly joined what actually were divisible claims. Ironically, in the trial court, Mackenzie successfully responded, in effect, that the claims should be joined because of their common facts and overlapping themes. Indeed, throughout the trial, and in closing argument, counsel for Mackenzie not only blended the evidence on the three surviving claims, but repeatedly and emphatically connected those claims to Mackenzie's termination. Despite the summary judgment dismissal of the wrongful termination claim, Mackenzie's counsel continued to pursue the connections among the remaining claims and the termination. Thus, *as actually litigated*, all Mackenzie's claims breathed through only one "lifeline"—Miller's alleged "improper performance of [his] employment contract." *See id.*

¶ 29. Therefore, reduced to its essence, the question simply is whether Miller, aside from any contractual obligations it may have had, also had "an independent duty . . . to refrain from misrepresentation" that induced Mackenzie to continue employment. *See id.* We conclude that, under *Tatge*, the answer is no.

¶ 30. Mackenzie, citing numerous cases, maintains that courts have allowed claims for fraudulent

inducement to *continue* employment.[4] Miller responds that "[e]very case recognizing a tort claim for misrepresentation against an employer and cited by Mackenzie is premised on misrepresentations made to *induce acceptance*, rather than continuance, of employment." Miller is incorrect. Although some of the cases Mackenzie cited considered circumstances involving inducements to accept employment, most dealt with circumstances involving inducements to continue employment.[5]

---

[4] Mackenzie cites: *Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir. 1992); *Marfia v. T.C. Ziraat Bankasi*, 903 F. Supp. 463 (S.D.N.Y. 1995), *judgment vacated and cause remanded*, 100 F.3d 243 (2d Cir. 1996); *Tolbert v. United Insurance Co. of America*, 853 F. Supp. 1374 (M.D. Ala. 1994); *Franz v. Iolab, Inc.*, 801 F. Supp. 1537 (E.D. La. 1992); *Shaitelman v. Phoenix Mutual Life Insurance Co.*, 517 F. Supp. 21 (S.D.N.Y. 1980); *Lazar v. Superior Court*, 909 P.2d 981 (Cal. 1996); *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 7 Cal. Rptr. 2d 859 (Ct. App. 1992); *Gardner v. Celanese Corp. of America*, 76 S.E.2d 817 (Ga. Ct. App. 1953); *Hanlon v. Macfadden Publications, Inc.*, 99 N.E.2d 546 (N.Y. 1951); and *Offshore Petroleum Divers, Inc. v. Cromp*, 952 S.W.2d 954 (Tex. App. 1997).

[5] Mackenzie also argues that even those cases involving inducements to *commence* employment are supportive of his theory regarding inducements to *continue* employment. We are not convinced. For the most part, courts reviewing actions for fraudulent inducements to commence employment have focused on the employees' circumstances preceding the at-will employment relationships, and on the inducements and decisions leading to employment. Generally, these factors, such as current employment status and salary, competing offers or opportunities, and relocation costs, specifically relate to inducements to commence, not continue, employment. *See* Sandra J. Mullings, *Truth-In-Hiring Claims and the At-Will Rule: Should an Employer Have a License to Lie?*, 1997 COLUM. BUS. L. REV. 105; *see also Palmer v. Beverly Enters.*, 823 F.2d 1105, 1113 (7th

¶ 31. Still, a review of the numerous cases cited by Mackenzie, Miller, and the *amicus* briefs reveals that while some courts have recognized the tort Mackenzie proposes,[6] others have declined to do so. Some

Cir. 1987) (" 'It is well settled that a "promise made with no intention of performing is actionable fraud where the other party relies upon it as an inducement to enter into an agreement." ' ") (quoted sources omitted); *Tolbert*, 853 F. Supp. at 1377 (holding that "state court could find that [employee] has suffered actionable injury in that [misrepresentations made to induce acceptance of employment] were collateral to his status as an employee at will"); *Lazar*, 909 P.2d at 988 (holding that claim for fraudulent inducement to accept employment was actionable where "[employer's] misrepresentations were made before the employment relationship was formed, when [employer] had no coercive power over [prospective employee] and [prospective employee] was free to decline the offered position"); *see also Berger v. Security Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1384 (Colo. Ct. App. 1990) ("An employer's right to terminate an at-will employee without cause does not protect the employer from liability for fraud in inducing the employee to accept employment."); *cf. Redies v. Nationwide Mut. Ins. Co.*, 711 F. Supp. 570, 572 (D. Colo. 1989) ("This Court concludes that plaintiff's claims for fraud, false representation, non-disclosure or concealment, and negligent misrepresentation may be maintained based on representations regarding future conditions of employment.").

[6] *See Stewart*, 976 F.2d at 87, 90 (misrepresentation of present fact is actionable under theory of fraudulent inducement to enter into and continue employment); *Marfia*, 903 F. Supp. at 466, 470 (promise made with "preconceived and undisclosed intention of not performing it" constitutes misrepresentation of present fact and is actionable under theory of fraudulent inducement to reject job offer from different employer and continue present employment); *Franz*, 801 F. Supp. at 1542–43 (at-will employee may maintain action for fraudulent inducement to accept or continue employment); *Shaitelman*, 517 F. Supp. at

reason that, absent a special, confidential or fiduciary employer-employee relationship, employers have no duty, outside their contractual obligations, to disclose information to at-will employees that could conceivably affect the employees' decisions to continue employment. *See Piekarski v. Home Owners Sav. Bank*, 956 F.2d 1484, 1495 (8th Cir. 1992) ("employer has no duty to disclose to an employee that he has placed items in his [personnel] file"); *Sabet v. Eastern Va. Med. Auth.*, 775 F.2d 1266, 1270 (4th Cir. 1985) ("[S]ilence cannot give rise to liability for fraud in the absence of a duty of disclosure."); *Wilson v. Sysco Food Servs. of Dallas, Inc.*, 940 F. Supp. 1003, 1014 (N.D. Tex. 1996) ("In the absence of an agreement to disclose, a duty to disclose arises only where there is some special relationship between the parties, such as a fiduciary or confidential relationship."); *Lehner v. Crane Co.*, 448 F. Supp. 1127, 1131 (E.D. Pa. 1978) ("[A]n employer-employee relationship does not, in and of itself, give rise to a fiduciary relationship from which a duty to disclose could be derived."); *see also White v. National Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991) ("[A]ny court-imposed

22–23 (claim for fraudulent misrepresentation regarding inducement to continue employment is actionable); *Hanlon*, 99 N.E.2d at 549–51 (employer's intentional misrepresentation of material facts in order to fraudulently induce continuance of employment is actionable); *cf. Marketing West*, 7 Cal. Rptr. 2d at 865 (Even if there is no duty to disclose, when a person chooses to speak, " 'either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure.' ") (quoted source omitted); *Gardner*, 76 S.E.2d at 818–19 (cause of action exists against any employer who fraudulently misrepresents employee's employment status, interfering with employee's right to earn a living).

affirmative duty to inform employees of conditions of employment . . . may lead to diminution of West Virginia's at will doctrine."); *Holloway v. Doug Fisher, Inc.*, 865 F. Supp. 412, 421 (E.D. Mich. 1994) (plaintiff failed to establish that employer-employee relationship constituted "confidential relationship" giving rise to duty to disclose); *Berda v. CBS Inc.*, 800 F. Supp. 1272, 1278 (W.D. Pa. 1992) (employer had no duty to disclose to employees "significant corporate plans," including possibility of layoffs). For reasons we will explain, we find more persuasive the reasoning reflected in those decisions declining to recognize the tort Mackenzie proposes.

¶ 32. The fact that Wisconsin courts have not recognized the duty to disclose on which Mackenzie premises his intentional misrepresentation claim does not mean that we could not do so. After all, if *Tatge* does not preclude Mackenzie's misrepresentation theory, then the policy rationale he offers, if meritorious, could bring legal life to his claim. *See Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 30, 288 N.W.2d 95 (1980) ("Courts have departed from or relaxed the 'no duty to disclose' rule by carving out exceptions to the rule and by refusing to adhere to the rule when it works an injustice."). We conclude, however, that while at first glance Mackenzie's policy arguments sail smoothly, they ultimately crash on the reef of reality.

B. DUTY TO DISCLOSE—"A POLICY DETERMINATION"

¶ 33. No tort liability arises from a failure to disclose information absent a duty to disclose. *See Lecic v. Lane Co.*, 104 Wis. 2d 592, 604, 312 N.W.2d 773 (1981) ("The general rule is that silence, a failure to disclose a fact, is not misrepresentation unless the nondisclosing

party has a duty to disclose that fact."); *see also Ollerman*, 94 Wis. 2d at 26 (no tort liability arises from failure to disclose, absent duty to disclose). Whether a duty to disclose exists presents a question of law. *See Ollerman*, 94 Wis. 2d at 27.

¶ 34. "[W]hen a court resolves a question of legal duty the court is making a policy determination." *Id.* at 27. Quoting Dean Prosser, the supreme court explained:

> "In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.' "

*Id.* at 28 (quoted sources omitted). "Whether one has a duty to disclose a fact in a particular set of circumstances is essentially a policy decision, and it is, therefore, properly decided as a question of law." *Hennig v. Ahearn*, 230 Wis. 2d 149, 167, 601 N.W.2d 14 (Ct. App. 1999). Thus, resolving the "question of legal duty" in the instant case, we must examine *Tatge* not in isolation, but in consideration of this "interplay" of law and policy.

¶ 35. Mackenzie, the Wisconsin Academy of Trial Lawyers, and the Wisconsin Employment Lawyers Association warn against any preclusion of misrepresentation claims. Understandably, they resist any rule of law that would seem to allow anything less than

open and honest communication between employers and employees. We acknowledge their legitimate concerns. And yet, while it may seem counterintuitive to ever foreclose a claim for misrepresentation, we take pains to explain why employers dare not read this decision as permission to deceive their employees, and why, in this case, the preclusion of Mackenzie's tort claim for misrepresentation is consistent with sound public policy.

¶ 36. First, *despite* the preclusion of such tort claims, most misrepresentation will meet its match. Depending on the circumstances, criminal prosecutions and contract claims may be possible. Moreover, market forces remain powerful and, in some ways, provide protective deterrents to deceit. After all, employers who mislead their employees risk embarrassing exposure that, ultimately, will reduce their reputations and profits. Clear economic analysis should lead employers to understand that misrepresentation will motivate their best employees to resign, and jeopardize their ability to attract qualified personnel.[7]

---

[7] As Butler and Chauvin explain:

In many instances, employers are prevented from abusing the discretion of the employment-at-will doctrine because market forces constrain arbitrary behavior. Consider the following proposition. An employer who develops a reputation for unjustly firing her employees will have a difficult time attracting good employees. Employees who take the risk of working for such an employer are usually being compensated in the form of higher wages. This proposition may not be immediately obvious. The initial reaction is that such an abusive employer would be unlikely to offer higher wages to her employees. Workers with alternative employment opportunities will choose to not work for this employer; instead they will work for other employers who are not as prone to fire employees without cause. This will leave our "firing" employer with a choice of workers who are unable to find jobs with other employ-

¶ 37. Second, *because* of the preclusion of such tort claims, the at-will employment relationship will retain flexibility that, in a free-market economy, provides critical advantages to *both* employers and employees. Emphasizing the employers' concerns, Miller explains:

> Employers cannot possibly anticipate all the employment-related information that an employee may rely on in deciding to continue employment; it would be extraordinarily unfair to employers to create a duty to disclose, where this element of "reliance" arises with hindsight, after the employee has been discharged. Creating a duty to disclose would cause massive disruption in the workplace, spawning claims with no reasonable stopping point—there are a whole myriad of things that employees could argue should have been disclosed, such as a failed merger, acquisition attempts, falling sales, the CEO's health, and the like. The list is virtually endless and to impose a duty to disclose on employers would be an intolerable burden.

---

ers at a comparable wage. Accordingly, the lower quality employees are paid higher wages to work in the job where they have a greater likelihood of being fired. Thus, our hypothetical employer pays higher wages not out of choice, but through the natural selection process from the available pool of workers choosing where they want to work. Of course, this analysis does not apply to all employment situations, but it does serve to point out that profit maximizing businesses do not exercise their right to fire at will lightly.

Henry N. Butler and Keith W. Chauvin, *Economic Analysis of Labor Markets: A Framework for Analyzing Employment Law Issues*, 8 KAN. J.L. & PUB. POL'Y 1, 10–11 (1999) (footnotes omitted). Although Butler and Chauvin are focusing on the economic consequences of unjust terminations, their reasoning applies with equal force to employers whose misrepresentations would motivate an employee exodus.

But employers are not the only ones who have an interest in flexible, unencumbered at-will relationships. As Wisconsin Manufacturers and Commerce argues in its *amicus curiae* brief, "notions of fundamental fairness" would require an employer-employee duty to disclose to become "a two-way street":

> [W]ould not employees be under a duty to disclose to employers whenever they were considering quitting, or were interviewing for other positions? Had it known that an employee was considering leaving, an employer often would have taken other action, such as shifting job duties. Under such circumstances, are employees liable to their employers?

¶ 38. Mackenzie attempts to deflect Miller's predictions of "massive disruption in the workplace" and "myriad of things that employees could argue should have been disclosed." He trims his duty to disclose theory to "the narrow proposition that when an employee asks an employer for information which the employer knows may affect the employee's decision to exercise his at-will freedom to quit, the employer conceals the information from the employee at its peril." Interestingly enough, however, the impracticality—indeed, the virtual impossibility—of imposing a duty to disclose is apparent from the very scenario Mackenzie attempted to establish in this case.

¶ 39. After all, if we accept Mackenzie's "narrow proposition": (1) the "employer" (that is, the actual person an employee asks for information) would have to determine which answers to a subordinate's many inquiries "may affect the employee's decision to exercise his at-will freedom to quit"; (2) the "employer" would have to remember those inquiries and answers and be responsible for updating the answers for the

duration of the employee's employment; and (3) the "employer," if transferred, retired, or terminated, would have to record or pass on that information to any successor who, in turn, would be responsible for updating the employee. No employee could *reasonably* expect such continuing disclosure. *See Hennig*, 230 Wis. 2d at 166 ("[U]nder the [RESTATEMENT (SECOND) OF TORTS § 551(2)(e) (1977)] approach adopted in *Ollerman*, the crucial element in determining whether a duty of disclosure exists is *whether the mistaken party would reasonably expect disclosure*.") (emphasis added). Thus, Mackenzie's "narrow proposition" does not begin to account for reality—particularly in large businesses, with hundreds or even thousands of at-will employees, and with employer-employee communication encompassing countless subjects affecting an employee's decision to continue employment.

¶ 40. Mackenzie maintains, nonetheless, that at-will employment relationships thrive in a free market economy only when both employer and employee make their employment decisions based on accurate and complete information. Once again, with support from both the Wisconsin Academy of Trial Lawyers and the Wisconsin Employment Lawyers Association, he proclaims the value of honesty in employer-employee communication. We echo that proclamation. And yet, once again, as counterintuitive as any compromise of candor may seem, the analysis of the duty to disclose is not as simple as Mackenzie suggests.

¶ 41. For any number of valid reasons, *employees*, in furtherance of *their* personal or professional interests, may choose to conceal information—illness, pregnancy, disability, job search—from their employers even though their employers may suffer as a result. And employers, for any number of valid reasons, may

choose to conceal important information from employees. As the Human Resources Management Association illustrates in its *amicus* brief:

> [A]ssume a company that is in an extremely dire financial position determines that it will have to layoff [sic] approximately twenty percent of its workforce in order to remain a viable concern. At the same time, the company is very close to securing a large amount of new business that will help ensure the company's continued viability. Management believes that without the new business, the company would cease to exist and all of its employees would lose their jobs.
>
> Management determines that announcing the layoff at that particular time could jeopardize its ability to secure the new business. It decides to wait a couple of months before it announces the layoff decision to ensure that the layoff announcement will not jeopardize the business transaction. Management's decision helps to ensure its continued operation and the continued employment of a majority of its workforce.

And, as Wisconsin Manufacturers and Commerce points out, "information which might be of greatest interest to an employer's competitors would also be that which might arguably be considered material to its employees' decision to continue to work for the employer (*e.g.*, financial reversals)."[8] Thus, unquestionably, while *honesty* is a virtue rewarding both

---

[8] *See Berda v. CBS Inc.*, 800 F. Supp. 1272, 1278 (W.D. Pa. 1992):

> Plaintiffs' argument that because someone in CBS, Inc. had knowledge of the proposed format change, CBS, Inc. is guilty of fraud for failing to disclose the prospect of possible layoffs to Berda rests on the notion that upper management of a large corporation has a duty to discuss significant corporate plans with the employ-

employers and employees, the nature, timing, and duty of *disclosure* remain complicated.

¶ 42. We do not suggest that courts will countenance an employer's misrepresentations regardless of the contract or circumstances. We recognize that deceit may set deadly traps, and we are loath to let innocent victims be snared. But the resulting legal action—whether for breach[9] or some other violation of an employment contract—lies not in tort, but in contract. *See Tatge*, 219 Wis. 2d at 105–09;[10] *see also White*, 938 F.2d at 491 ("Broken promises are the substance of contract law and are not to be shoehorned into an ill-fitting suit of fraud."). The distinction is more than academic. At the very least, available remedies

---

ees who may ultimately be affected. Appealingly populist as this is, it is simply not the law.

[9] "[G]ood faith is often called an implied condition in every contract." *Hale v. Stoughton Hosp. Ass'n*, 126 Wis. 2d 267, 274, 376 N.W.2d 89 (Ct. App. 1985); *see also Crown Life Ins. Co. v. LaBonte*, 111 Wis. 2d 26, 44, 330 N.W.2d 201 (1983). Thus, although the supreme court, in *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983), "refuse[d] to impose a duty to *terminate* in good faith into employment contracts," *id.* at 569 (emphasis added), the court did not reduce the good faith obligations of an employer toward an employee in a continuing, at-will employment relationship, *see Hale*, 126 Wis. 2d at 274 ("*Brockmeyer* does not relieve an employer of contractual obligations it has undertaken.").

[10] Exceptions exist, however, so that in addition to contract claims, tort actions based on a "special duty" may arise "[b]y virtue of the relationship between the parties created by the contract." *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 686, 271 N.W.2d 368 (1978) (involving the special fiduciary relationship between insurer and insured giving rise to both contract claim for breach and tort claim for bad faith).

and potential damages turn on whether the misrepresentation claim is recognized in contract or in tort. *See Dvorak v. Pluswood Wis., Inc.*, 121 Wis. 2d 218, 220–21, 358 N.W.2d 544 (Ct. App. 1984) (breach of employment contract is actionable in contract, not tort; therefore, backpay and reinstatement, not punitive damages, are recoverable).

¶ 43. Accordingly, we conclude that the creation of an employer's duty to disclose information potentially affecting an employee's decision to continue employment would undermine sound public policy. It would reduce the at-will employment flexibility that is so valuable to both employers and employees. It would be virtually impossible to implement and enforce. It would leave both employers and employees forever guessing at the limits of their responsibility and potential liability. *See generally Kelli T-G. v. Charland*, 198 Wis. 2d 123, 130, 542 N.W.2d 175 (Ct. App. 1995) ("virtual impossibility of defining a sensible starting or stopping point" precludes tort cause of action on public policy grounds).[11]

---

[11] Once again, Butler and Chauvin provide helpful analysis:

In recent years, state courts have been moving away from a "strict" application of the employment-at-will doctrine. Recent opinions have limited the "at will" doctrine through an extension of contract law doctrine and an implied "good faith" contract term that prevents termination without cause. This approach limits the discharge of employees for malicious purposes, such as resisting sexual advances or to avoid paying an employee commissions earned but not vested. Other cases alter the doctrine on the grounds that the employee's firing violated some "public policy," such as discharge for serving jury duty or filing a complaint with a regulatory agency. Almost one-half of the states have modified the doctrine in some manner. The typical justification for judicial or statutory modification of the employment-at-will doctrine is that society has become more complex and thus complex legal rules are necessary to deal with complicated interdependencies. Such a con-

## C. MACKENZIE'S EVIDENCE

¶ 44. Miller also argues that Mackenzie failed to prove any of the elements of intentional misrepresentation. Our conclusion, under *Tatge*, could obviate the need to address this argument. Here, however, while we have rejected Mackenzie's *Tatge* interpretation, we also have acknowledged the three passages in *Tatge* that, arguably, may allow more latitude than we have recognized, as well as the case law that does recognize the tort of fraudulent inducement to continue employment. Thus, we go on to explain that even if Mackenzie's misrepresentation claim, by virtue of being independent of his wrongful discharge claim, were not precluded by *Tatge*, it still would fail—for lack of evidence of any of the elements of intentional misrepresentation.

¶ 45. The supreme court has articulated the elements of intentional misrepresentation: "[F]irst, there

---

clusion, however, does not necessarily follow. For example, it seems just as plausible that simple rules are more appropriate for dealing with complex fact patterns. In general, the more complicated the facts and the more "sophisticated" the legal rule, then the less likely that contracting parties will understand the legal consequences of their actions and the less likely that the bargain will encompass all foreseeable consequences. The abandonment of a simple rule like the employment-at-will doctrine is as likely to frustrate peoples' expectations as it is to facilitate their realization.

Butler & Chauvin, *supra*, at 11 (footnotes omitted). This is not to suggest that those courts qualifying the employment-at-will doctrine on public policy grounds have not been warranted in doing so. But, as Butler and Chauvin imply, courts carving out exceptions to the doctrine must do so carefully, and with economically astute appreciation of real economic consequences—for both employer and employee—that, at first glance, might not be apparent.

must be a false representation of fact; second, it must be made with intent to defraud and for the purpose of inducing another to act upon it; third, such other person must rely on it and thereby be induced to act, to his own injury or damage." *Lundin v. Shimanski*, 124 Wis. 2d 175, 184, 368 N.W.2d 676 (1985).

¶ 46. "When reviewing jury verdicts on appeal, we view the evidence most favorable to the verdict and affirm if there is any credible evidence upon which the jury could have based its decision." *Id.*[12] Deference to the jury's verdict is even greater when it has been approved by the trial court. *See Staehler v. Beuthin*, 206 Wis. 2d 610, 617, 557 N.W.2d 487 (Ct. App. 1996). Here, after a thorough review of the parties' briefs and their specific record references, after extensive questioning of counsel at oral argument, and after a painstaking review of the trial record (based on the oral arguments and supplemental briefs), we conclude that Mackenzie failed to present evidence establishing any of the elements of intentional misrepresentation.

¶ 47. As we have explained, Mackenzie's theory is that, in 1987, Smith misinformed him that the reorganization that had occurred after Glickert was hired did not affect his job status and that, in 1989, Smith failed to inform him that his position had been downgraded. At oral argument, Mackenzie's counsel clarified that even though Mackenzie had not proven

---

[12] *See* WIS. STAT. § 805.14(1) (1997–98):

No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

that Smith misinformed him of anything in 1987, and even though Mackenzie never asked Smith or anyone else about his job status in 1989, the jury still could have "believed": (1) Mackenzie's position had been downgraded *in 1987*; (2) Smith knew that, and misinformed Mackenzie *in 1987*; and/or (3) even if Mackenzie's position had *not* been downgraded *in 1987*, and even if Smith had not misinformed him *in 1987*, Smith intentionally deceived him, *in 1989*, by not informing him that his position had been downgraded *in 1989*.

¶ 48. Throughout Mackenzie's questioning of trial witnesses, closing arguments, briefs, and oral arguments to this court, his theory, tenuous at best, slips and slides between the events of 1987 and 1989. Although one might expect that such a lengthy trial transcript would reveal countless passages from which Mackenzie's purported proof would emerge and, therefore, that an earnest review of the record would inevitably lead to evidence that, even if slight, was sufficient, such is not the case. Indeed, as implicitly conceded in his briefs, and explicitly conceded at oral argument, Mackenzie can point to only a few portions of testimony that give even a hint of support to his theory. And even those fail under careful analysis. Like a shaky swingdancer searching for the right step, Mackenzie stumbles between the events of 1987 and 1989 and, ultimately, provides no evidence proving intentional misrepresentation.

1. FALSE REPRESENTATION OF FACT

¶ 49. The record provides absolutely no evidence that Mackenzie's position was downgraded *in 1987*. It establishes only that, in 1987, Mackenzie's responsibilities were affected after Glickert was hired. Mackenzie

testified that, in 1987, he asked Smith: "Does [the reorganization] affect my Grade Level? It's half my area. Is this going to get me downgraded?" Smith, Mackenzie testified, answered "no," that "it's not going to affect you at all."

¶ 50. The *only* evidence on which Mackenzie's appellate brief relies to suggest that Smith's response was false is Smith's answer to a written interrogatory, utilized by Mackenzie's counsel in examining Smith at trial. Smith acknowledged, at trial, that in answering the interrogatory, he stated that "at the time Glickert joined Miller," he (Smith) "informed Mr. Mackenzie that his position had been grandfathered," thus implying that the downgrading of Mackenzie's position actually occurred *in 1987*. Mackenzie's appellate brief, however, neglects to quote Smith's undisputed trial testimony surrounding that exchange, clarifying that, in answering the interrogatory, he simply had been mistaken about the chronology; he had mixed up the events of 1987, "when Glickert came to Miller," and 1989, when "[t]he grandfathering issue came into play."

¶ 51. The only other passage on which Mackenzie relies is, at best, utterly ambiguous and, under careful analysis, it provides absolutely no support for Mackenzie's theory. Referring to a 1992 conversation in which Smith informed him that his position had been downgraded years before, Mackenzie testified:

> A: Mr. Smith told me that this [downgrading] was due to when Mr. Glickert came in to his area, and they transferred a large number of my people to his responsibility. That that caused my rating to be downgraded.

39

Q: And *that* would have been what year?

A: 1987.

(Emphasis added.) What does that italicized "that" refer to—when Glickert came into Smith's area; when Mackenzie's rating was downgraded? Contextually and grammatically, there seems to be no way to tell. But logically, and most importantly, nothing in this portion of Mackenzie's testimony, or any other evidence, connects the italicized "that" to anything Smith did or said to misrepresent or conceal anything.

¶ 52. Indeed, the only logical reading of this passage precludes any connection to what Smith did or said and, therefore, *counters* Mackenzie's theory. After all, in answering, "1987," Mackenzie obviously was not suggesting that Smith informed him *in 1987* of the downgrading; Mackenzie's theory was that Smith *failed to do so.* And if, in answering, "1987," all Mackenzie was saying was that that was the year Glickert came into Smith's area, the testimony would be of no consequence; the year of Glickert's arrival was never in dispute. Thus, this apparently ambiguous testimony, logically analyzed, is either Mackenzie's inconsequential statement of Glickert's year of arrival, or nothing more than Mackenzie's opinion, supported by no evidence, that he had been downgraded in 1987.

¶ 53. Notably, *nothing* else, anywhere in the trial record, established that any downgrading occurred until 1989 when, it is undisputed, Mackenzie's position and those of hundreds of other employees were downgraded. Indeed, Mackenzie testified that he "learned that [his position] had been reevaluated in 1989, and that Mr. Smith had signed off on it in 1989 that it would be a 13 not a 14." Miller Brewing records confirmed that Mackenzie's position was downgraded,

effective May 17, 1989. In closing argument, Mackenzie's counsel referred to "1989, when [Mackenzie] was downgraded on the books to a 13," and to Mackenzie being "grandfathered in '89." And on appeal, Mackenzie concedes that "the downgrade . . . was formalized" not in 1987, but in 1989, and that "[i]ndisputably Smith knew Mackenzie was downgraded in 1989."

¶ 54. Mackenzie fully concedes that, in 1989, he never asked Smith or anyone else whether his position had been downgraded as a result of the reevaluation of hundreds of positions. Noting that he was asked to advise his subordinates of their downgrading, Mackenzie never suggests that Miller was attempting to conceal the downgrading, generally, or that, had he inquired, Miller would have denied him the information, specifically. *See McCoy v. Spelman Mem'l Hosp.*, 845 S.W.2d 727, 732 (Mo. Ct. App. 1993) (regarding employee's fraud allegation, employer had no duty to inform employee of *reasonably ascertainable* facts concerning his employment) (emphasis added); *see also Null v. K & P Precast, Inc.*, 882 S.W.2d 705, 708 (Mo. Ct. App. 1994). Mackenzie also acknowledges that, even after the downgrading of his position in 1989, he was grandfathered so that he retained his grade level, salary and all benefits until, as he was notified in an August 1992 memo, effective January 1, 1993, he would be reduced to grade level 13 and would lose his eligibility for stock options. Thus, according to the evidence, Smith's answer to Mackenzie in 1987—that while Mackenzie's responsibilities had been affected, his grade level status was unaffected by the reorganization—was true in 1987 and remained true in 1989, even after the downgrading of Mackenzie's position.

¶ 55. Therefore, at most, Mackenzie may be correct in believing that, in 1989, his position, among others, may have been downgraded due, at least in part, to the altered responsibilities brought about by the reorganization of 1987. But that simply does not constitute *any* evidence that Smith lied to him in 1987, or concealed anything from him in 1989. *See Chitwood v. A.O. Smith Harvestore Prods., Inc.*, 170 Wis. 2d 622, 631, 489 N.W.2d 697 (Ct. App. 1992) (Regarding intentional misrepresentation, "[g]enerally, the false representation must relate to present or preexisting facts and cannot be merely unfulfilled promises or statements of future events.").

## 2. INTENT TO DECEIVE

¶ 56. Even assuming Smith misinformed him in 1987 (that the reorganization did not affect his job status) or failed to inform him in 1989 (that his position had been downgraded), Mackenzie offered no evidence that Smith or anyone else at Miller Brewing did so in an effort to induce him to continue employment. In fact, in closing argument, Mackenzie's counsel contended that while Smith "made a horrible mistake" in his communication with and treatment of Mackenzie, he was a "decent enough fella." As Miller argues:

> There was no evidence that Smith or Miller believed, or had reason to believe, that Mackenzie ever considered leaving Miller or needed an inducement to remain. To the contrary, Mackenzie admits that at no time did he consider leaving Miller, including after he admittedly learned of the grade level change. There also was no evidence that Smith or Miller believed, or had reason to believe, that Mackenzie would choose to leave Miller if he knew

that his successor would be a grade level 13, rather than a grade level 14.

Mackenzie maintains, however, that "the jury could draw the common sense conclusion that a demotion would prompt a reasonable person in Mackenzie's position with his ambition and talents, to look for work elsewhere, and that Smith feared this." But Mackenzie provides no evidentiary basis for this fear. In fact, as we will explain, a "common sense" assessment of the evidence refutes even the most speculative sense that Miller intended to deceive Mackenzie.

¶ 57. Mackenzie offered evidence establishing that he was a valuable employee with exceptional computer skills and, therefore, that Miller Brewing certainly would have wanted his continued employment. But his evidence also belies the notion that Miller, starting in 1987 and continuing through 1989 and until August 1992, somehow managed to make a series of intentional misrepresentations in order to induce Mackenzie to stay. The contradictions are obvious:

(1) On the one hand, Mackenzie maintains that he was virtually irreplaceable; on the other hand, he contends that Miller downgraded his position (and grandfathered him, thus gaining no financial benefit from the downgrading as long as he remained in his position), despite knowing that if he found out his position had been downgraded, he would leave.

(2) On the one hand, Mackenzie maintains that the downgrading was the "kiss of death" that destroyed his potential for advancement—at Miller or elsewhere; on the other hand he contends

43

that, despite the downgrading, he was in line for a significant promotion, torpedoed only by Smith's opposition.

(3) On the one hand, Mackenzie maintains that Miller singled him out, from among hundreds of downgraded employees, in order to deceptively induce him to continue employment; on the other hand, as his attorney ultimately argued to the jury, "[t]hey were out to get this guy," subsequently terminating him based on unsubstantiated complaints of sexual harassment.

"Common sense," based on the evidence, confirms that Mackenzie failed to prove any intent to deceive.

### 3. RELIANCE

¶ 58. Mackenzie offered no evidence that he relied, to his detriment, on any misrepresentation. His theory, simply, was that in 1987 or 1989, had he known his position had been downgraded, he could have sought other employment but, by 1992, having aged and occupied a downgraded position for several years, he was less marketable. Mackenzie, however, never stated that he would have sought other employment. He testified that he "never considered leaving Miller Brewing Company for another job." He offered no evidence of a job opportunity ignored or an offer declined due to his misconception of his grade level status.

¶ 59. To prevail on his intentional misrepresentation claim, Mackenzie would have had to have shown that he justifiably relied on a misrepresentation of fact. *See Williams v. Rank & Son Buick, Inc.*, 44 Wis. 2d 239, 245–46, 170 N.W.2d 807 (1969). Once again, Mackenzie failed to prove anything; his evidence was

speculative at best. Speculation is not a proper basis for a jury decision. *See Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 791, 541 N.W.2d 203 (Ct. App. 1995) (verdict cannot be based on "conjecture and speculation"); *Cudd v. Crownhart*, 122 Wis. 2d 656, 662, 364 N.W.2d 158 (Ct. App. 1985) (verdict cannot be based on "mere speculation").

### 4. DAMAGES

¶ 60. Mackenzie offered no evidence of any other employment he might have obtained between 1987 and 1993. In fact, his damages evidence consisted entirely of what he summarized in a trial exhibit titled, "Lost Salary and Benefits *Due to Termination*." (Emphasis added.) He offered nothing providing any causal connection between Miller's alleged misrepresentations and the *termination* damages he introduced at trial.

¶ 61. Thus, at oral argument, Miller pounded away at Mackenzie's failure to prove *misrepresentation* damages—the difference between what Mackenzie earned at Miller Brewing between 1987 or 1989 and 1993, and what he would have earned elsewhere during the same period. At oral argument, Mackenzie barely responded. Even more telling, in his supplemental letter brief to this court, Mackenzie, while first attempting to tie termination damages to his misrepresentation claim, ultimately contended only that "[t]he jury reasonably could have inferred that but for Miller's deceit, [he] would have secured employment elsewhere at a marketable age and received wages and benefits *comparable to those provided by Miller*." (Emphasis added.) Obviously, if what Mackenzie would have received elsewhere would have been *comparable* to what he actually did receive at Miller

45

Brewing, he suffered no financial loss prior to his termination. Essentially, therefore, Mackenzie has offered nothing to counter Miller's contention that he proved no misrepresentation damages. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments deemed admitted).[13]

## II. Tortious Interference With Prospective Contract

¶ 62. Regarding Mackenzie's second cause of action, Miller argues that "Smith cannot be liable for tortious interference with Mackenzie's hoped for promotion because there was no proof of interference," and that "Smith's conduct was privileged as a matter of law." Miller is correct.

¶ 63. "There can be tort liability for interference with a contract terminable at will," *id.* at 104, and our courts do recognize "a cause of action for the intentional interference with a prospective contractual relation," *Cudd*, 122 Wis. 2d at 657–58. Interference alone, however, does not establish the tort; the interference must be "improper." *See Liebe v. City Fin. Co.*, 98

[13] We should clarify that, to accept Miller's argument that Mackenzie proved no misrepresentation damages, we need not reject Mackenzie's *theory* that, depending on the circumstances, one could detrimentally rely on a misrepresentation, continue employment, miss out on more lucrative opportunities and, as a result, sustain damages. Here, however, even if we were to accept that theory, and even if we were to conclude that the evidence supported Mackenzie's misrepresentation claim in all other respects, we still would conclude that Mackenzie, having utterly failed to introduce any evidence of misrepresentation damages, would be entitled to recover nothing.

Wis. 2d 10, 15, 295 N.W.2d 16 (Ct. App. 1980). Further, "the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract" or prospective contract. *See id.* at 13.

¶ 64. Generally, in the context of discussing whether one is "privileged" to communicate information that interferes with a prospective contract, we "substitute[ ] a concept of 'propriety' for privilege and provide[ ] that 'one who "intentionally and improperly" interferes with the performance of a [prospective] contract is liable.' " *See Hale v. Stoughton Hosp. Ass'n,* 126 Wis. 2d 267, 281, 376 N.W.2d 89 (Ct. App. 1985) (quoted source omitted). Thus, in this opinion, in evaluating Miller's claim of "privilege," we write in terms of whether Smith's conduct was proper or improper. Determining whether interference is "improper," we consider:

(a) The nature of the actor's conduct;

(b) The actor's motive;

(c) The interests of the other with which the actor's conduct interferes;

(d) The interest sought to be advanced by the actor;

(e) The social interests in protecting the freedom of action of the actor and the contractual interest of the other;

(f) The proximity or remoteness of the actor's conduct to the interference; and

(g) The relations between the parties.

*Cudd*, 122 Wis. 2d at 660–61. Here, we focus on these seven criteria by logically arranging them in two groups: (A) Smith's conduct, motive, intent, and relation to Mackenzie, and the proximity of Smith's conduct to the decision not to promote Mackenzie; and (B) Mackenzie's interest in being promoted, and the social interests in protecting the freedom of action of Smith and the contractual interest of Mackenzie. We conclude that Mackenzie failed to provide any evidence of improper conduct that would constitute tortious interference with his prospective contract.

A. SMITH'S CONDUCT, MOTIVE, INTENT, AND RELATION TO MACKENZIE, AND THE PROXIMITY OF SMITH'S CONDUCT TO THE DECISION NOT TO PROMOTE MACKENZIE

¶ 65. In 1992, Mackenzie served on a Miller Brewing task force which, he explained, was established "to evaluate the efficiency of Miller's distributors, and see if they could determine ways of increasing [their] performance." Tom Cardella headed the task force and presented its recommendations to Miller's president and executive steering committee, comprised of three vice-presidents: Dick Strup, Tom Koehler, and Robert Smith. Among other things, the task force proposed a new department, the creation of which would transfer personnel and responsibilities from Smith to Koehler. Koehler, with the assistance of Robert Schmitz, Personnel Services Manager, had primary responsibility for selecting the director of the new department.[14]

---

[14] Schmitz explained: "[T]he primary reason for the reorganization was to create a group to finish the design, and implementation, administration of what they called the map program, which is the market share achievement plan. And that was the nucleus of a new structure that would be in the sales

¶ 66. Smith was upset—with the proposed shift of his personnel and responsibilities to the new department and, he emphasized, with the fact that he had not been consulted before the task force presented its recommendations. Additionally, Smith disagreed with the task force recommendation of Mackenzie as director of the new department. Smith, however, voiced his most vigorous protests on the former subjects, not on Mackenzie's possible selection. Schmitz testified that "[Smith] was upset with the fact that he wasn't aware of the recommendations [that part of his area of responsibility would have been transferred to Mr. Koehler's area of responsibility]." Smith confirmed Schmitz's account, testifying: "I certainly had a discussion with Tom Cardella. . . . I chewed him out because I felt that the way that [the task force] presented this was unprofessional, and inappropriate, and really irritated me, because it had a major impact on my organization and people who worked for me."

¶ 67. While Smith acknowledged his irritation with the task force process and recommendations, he disclaimed comparable ire over Mackenzie's possible promotion. Smith testified:

> Q: Wasn't it a fact that you were very upset that Jerry Mackenzie was going to be appointed, at least it was recommended that he be appointed to the level of director, and that would have taken him completely away from you? And that he would have

organization." He confirmed that "a substantial portion of the workers that were to perform that work had previously functioned under Mr. Robert Smith's division, or his umbrella" and that the reorganization "was going to involve the shifting of certain employees from . . . vice-president Smith to vice-president Koehler."

49

been out of your area of control? Isn't that what you didn't like, the fact that Mackenzie was recommended for that position?

A: No.

Q: Did you support Mackenzie getting the job?

A: I don't know that I did.

Q: Well, if you were so upset that you made an issue about it, as you have told us, whichever way you want to say it, what did you do about it? Did you just get upset and that was it?

A: I had nothing to do with it.

Q: Did you support somebody who had worked for you for as long as Mr. Mackenzie worked for you, and that is, from 1984 [until] 1992, when you heard that that task force was recommending him to become a director, did you say, good, Jerry's got his chance now of being director? Did you not do that or not? [sic]

A: I didn't have any comment on it.

Q: But you certainly had a comment that you were upset with the way it was reported though.

A: Yes, I was.

Q: And part of what you were upset [about] was not only the way it was reported, but also the fact that Jerry Mackenzie was recommended to take over a new division as a director, correct?

A: I don't think that's accurate.

¶ 68. Notwithstanding Smith's disclaimer, however, Mackenzie points to evidence establishing that Smith opposed his appointment. Schmitz testified:

50

Q: One of the recommendations made to the committee was that Mr. Mackenzie head up the new department as director, would that be correct?

A: That was a suggestion that was made in the context of the formal recommendations.

Q: Did Mr. Smith object to you? Did Mr. Smith discuss with you, at any time, any reservations he had regarding Mr. Mackenzie assuming such a position?

A: Yes.

Q: When did he do that?

A: I think he brought it up briefly in our [en]counter directly after the board meeting, but we just—

Q: Go ahead.

A: We discussed it at that point.

Q: What did he say, if anything, about Mr. Mackenzie, at that time?

A: I believe, if I remember correctly, he was upset that I made a recommendation on staffing the structure that we recommended, and that I was out of line making that type of recommendation without specifically talking to other senior members, and human resources, and that maybe Jerry wasn't the best candidate for that position.

Q: Did he explain why he thought that?

A: Not in that meeting.

Q: Did he subsequently explain that?

A: Yes.

Q: And when did he do that?

A: I believe it was within a couple of days of the day we had the recommendation meeting.

Q: What did he say to you, at that time?

A: He basically re-expressed his displeasure at the way we expressed the recommendations.

Q: What did he express about Mr. Mackenzie two days later, approximately?

A: That he felt Jerry was not the right person to run the entire structure that we recommended.

Q: Did he give a reason for that belief or opinion?

A: Yes, he did.

Q: What was that reason?

A: He felt that Jerry was not a strong enough manager.

Q: Did Mr. Smith give any explanation for that statement?

A: He didn't go into detail.

Additionally, Schmitz testified that Cardella told him that Smith opposed Mackenzie's appointment. So, clearly, the record includes testimony to support Mackenzie's premise that Smith opposed his appointment and communicated that opposition to others. The record, however, contains absolutely no evidence that Smith, in so communicating, did anything improper.

¶ 69. Smith had been Mackenzie's supervisor; he was in a legitimate position to comment on Mackenzie's managerial abilities. *See Singleton v. Itson*, 383 S.E.2d 598, 600 (Ga. Ct. App. 1989) ("Divulging truthful information and expressing critical personal opinions about a co-employee's work are not wrongful or unlawful acts and those acts cannot, therefore, give rise to liability for tortious interference with contractual relations . . . ."). Smith was not alone in opposing Mackenzie's promotion. Paul Zielinski, Director of Distribution

52

Management at the time in question, testified at length about what he perceived to be Mackenzie's serious management style deficiencies. When Zielinski learned that Mackenzie was being considered for the directorship, he conveyed his concerns to Smith and Cardella. Additionally, Schmitz testified that he (Schmitz) told Cardella and Koehler that he "didn't think that [Mackenzie] was a good selection." Schmitz explained that although he recommended Mackenzie to head a division *under* the new director, he "didn't believe that Jerry Mackenzie had sufficient management skills to be able to form and manage" the new department. And Schmitz also testified that although Koehler had indicated that he "felt that, technically, Jerry was qualified for that position," Koehler was "not overly comfortable with [Mackenzie's] managerial style and skills."[15] Finally, Schmitz testified:

Q: As far as you know, Mr. Schmitz, was Bob Smith instrumental, in any way, in Jerry Mackenzie's not getting the director level position?

A: Not as far as I know.

Nor is that surprising. After all, according to the undisputed evidence, Smith was but one of several expressing reservations about Mackenzie's appointment and Smith, unlike Koehler and Schmitz, who both had misgivings about Mackenzie, was not in a position to make the final selection. Thus, Mackenzie's

[15] Read carefully, Schmitz's account of Koehler's opinion of Mackenzie allows for a different interpretation: that Koehler believed that Mackenzie was "not overly comfortable with [*his, i.e., Mackenzie's own*] managerial style and skills." Whichever interpretation one would adopt, however, it is clear that, *according to Schmitz*, Koehler had misgivings about Mackenzie's managerial readiness for promotion to a directorship.

assertion, in his brief to this court, that he "would have routinely become the new director but for Smith's objection" is baseless.

¶ 70. At trial, Mackenzie conceded that he was "never present at any meeting or discussion when Mr. Smith made any statements about whether or not [he] should be the director of this newly created department." Thus, Smith's conduct, established by the evidence, reduces to little more than saying, according to Schmitz's testimony, that Mackenzie "was not a strong enough manager." Therefore, while Mackenzie points to evidence disputing what others viewed as his management deficiencies, he utterly fails to establish that Smith communicated anything that was false. *See Liebe*, 98 Wis. 2d at 13 ("[T]ransmission of truthful information . . . does not constitute improper interference with a contract . . . ."). He barely responds to Miller's assertion that he "has not challenged the honesty of Smith's limited comments." *See Charolais*, 90 Wis. 2d at 109 (unrefuted arguments deemed admitted). And while Mackenzie may believe, as his counsel ultimately argued to the jury, that Smith and others were "out to get him," he fails to suggest any possible motive for Smith to do so. After all, whether Mackenzie or someone else became the new director, Smith's greater grievance would remain—either way, he stood to lose personnel and responsibility. *See Harman v. La Crosse Tribune*, 117 Wis. 2d 448, 455–57, 344 N.W.2d 536 (Ct. App. 1984) (determining whether defendant had good faith privilege in defense against action for interference with employment relationship, court considers defendant's intent and whether facts upon which plaintiff relies "reasonably support the inferences he draws").

## B. MACKENZIE'S INTEREST IN BEING PROMOTED, AND THE SOCIAL INTERESTS IN PROTECTING THE FREEDOM OF ACTION OF SMITH AND THE CONTRACTUAL INTEREST OF MACKENZIE

¶ 71. Courts have been reluctant to recognize an at-will employee's interest in a promotion and have protected a supervisor's freedom to comment on a subordinate's qualifications for advancement. For example, based on public policy grounds, the Arizona Court of Appeals refused to recognize the tort of wrongful failure-to-promote. *See Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562 (Ariz. Ct. App. 1995). The court, quoting *Ludwig v. C&A Wallcoverings, Inc.*, 960 F.2d 40, 43 (7th Cir. 1992), echoed the federal court's concerns:

> Recognizing a retaliation tort for actions short of termination could subject employers to torrents of unwarranted and vexatious suits filed by disgruntled employees at every juncture in the employment process. And why stop at demotions? If . . . a demotion raises the same policy concerns as a termination, so too would transfers, alterations in job duties, and perhaps even disciplinary proceedings. The potential for expansion of this type of litigation is enormous.

*Mintz*, 905 P.2d at 562; *see also Ramsey v. Rudd*, 272 S.E.2d 162, 164 (N.C. Ct. App. 1980) (supervisor not liable for tort of malicious interference with employment contract where his truthful report of subordinate's early departure from work led to subordinate's discharge); *Singleton*, 383 S.E.2d at 600 (employee not liable for tortious interference with employment contract where "[d]ivulging truthful information and expressing critical personal opinions about a co-employee's work" led to employer's independent

determination that the information warranted discharge of the co-employee).

¶ 72. Although, in this case, we need not determine whether Wisconsin recognizes the tort of wrongful failure-to-promote, we do consider, under the *Cudd* criteria, the "social interests" implicated by Mackenzie's tortious interference claim. Accordingly, we observe, even if Mackenzie had offered evidence that Smith's conduct was improper, he still would have faced a high hurdle. Mackenzie failed to account for important, practical policy concerns, fairly expressed by Wisconsin Manufacturers and Commerce:

> An employee must have the freedom to critique and honestly evaluate the performance of co-employees for promotions and job positions in order to properly serve the employer. It is difficult enough for an employer to receive honest, candid evaluations of co-employees without raising the risk of personal exposure. The prospect of liability would create a chilling effect, intimidating employees from giving accurate opinions, and would handicap many Wisconsin employers. Moreover, it would open the door to challenges by disgruntled candidates and scrutiny of the motives and good faith of the employee who gave the evaluation.

▆▆▆

¶ 73. In an action for intentional interference with a prospective contract, we will not allow a jury's verdict to stand where there are "no facts or inferences from any facts that could lead a jury to reasonably conclude" that the defendant's conduct was improper and where, ultimately, any such conclusion "would be mere speculation." *See Cudd*, 122 Wis. 2d at 662; *see also Foseid*, 197 Wis. 2d at 778–91 (holding that trial court was correct in overturning jury verdict in action

for intentional interference with prospective contract where jury " 'base[d] its findings on conjecture and speculation' ") (quoted source omitted).

¶ 74. Having reviewed the entire trial transcript and, in particular, having fastidiously focused on every record reference Mackenzie cites in support of his response to Miller's assertion that "there was no proof of interference," we can locate no support for Mackenzie's claim. Smith, Mackenzie's former supervisor, opposed Mackenzie's proposed promotion and said so. Koehler, with assistance from Schmitz, and apparently based, in part, on what Smith told them, decided not to promote Mackenzie. That's it; the rest is pure speculation. Once again, Mackenzie's proof proves to be no proof at all.[16]

---

[16] Having concluded that Mackenzie provided no evidence of improper conduct constituting tortious interference, we need not address the additional, intriguing argument presented by Miller and Wisconsin Manufacturers and Commerce: that because tortious interference requires interference with a prospective contract by a third party, and because a party cannot interfere with its own contract, and because Mackenzie pursued his action against Smith on a *respondeat superior* theory tying Smith to Miller Brewing, Mackenzie failed to even allege an actionable tortious interference. *See Wausau Med. Ctr., S.C. v. Asplund*, 182 Wis. 2d 274, 297, 514 N.W.2d 34 (Ct. App. 1994); *see also Piekarski v. Home Owners Sav. Bank*, 956 F.2d 1484, 1495 (8th Cir. 1992); *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 564–65 (Ariz. Ct. App. 1995).

## MACKENZIE'S CROSS-APPEAL

### I. Tortious Interference With Contract—Punitive Damages

¶ 75. In his third cause of action, Mackenzie claimed that Best "improperly induced" Miller Brewing to terminate him "by fraudulently misrepresenting . . . that she felt harassed by [his] . . . conversation with her regarding the Seinfeld program," and, further, that she "had no purpose or desire independent of intentionally causing [his] termination . . . by exerting moral pressure on Miller in fraudulently misrepresenting . . . that she felt harassed" by the conversation. On this claim, although the jury awarded Mackenzie $0 compensatory damages, it did award him $1,500,000 punitive damages. On postverdict motions, however, the trial court denied Mackenzie's request to change the jury's answer to the compensatory damages question, concluding:

> The jury heard a great amount of evidence against Patricia Best. Clearly, it concluded in its award of punitive damages its disapproval of her conduct toward Jerold Mackenzie.
> Equally clear, however, is the fact that the jury did not believe that her conduct contributed to the compensatory loss of Jerold Mackenzie.

The trial court then set aside the punitive damage award because the jury had not awarded Mackenzie any compensatory damages against Best. *See Tucker v. Marcus*, 142 Wis. 2d 425, 439, 418 N.W.2d 818 (1988) ("[P]unitive damages are not available where there has been no 'award' of actual damages.").

¶ 76. On cross-appeal, Mackenzie presents several related, alternative arguments: (1) the trial court erred in refusing to change the jury's answer to conform to what he claims was the undisputed evidence that "Best caused [him] compensatory damages in the amount of $4,771,056"; (2) the inconsistency of the compensatory and punitive damages verdicts requires a new trial; (3) the compensatory damage awards *against Miller Brewing and Smith* support the punitive damages award *against Best*; and (4) the punitive damages should stand, even in the absence of compensatory damages against Best, because of the "inherently damaging" nature of Best's conduct. We reject Mackenzie's arguments.

A. THE JURY'S ANSWERS / CONSISTENCY OF VERDICTS

¶ 77. This court will not disturb a damage award if there is a reasonable basis for the fact finder's determination. *See Cords v. Anderson,* 80 Wis. 2d 525, 552–53, 259 N.W.2d 672 (1977). Further, in reviewing such determinations, we view the evidence in the light most favorable to support the verdict. *See id.* at 553. Moreover, making that review, we are " 'aided by [the trial court's] analysis of the evidence and appraisal of the award,' " *id.* (quoted source omitted), but will review the entire record "as a matter of first impression" where a trial court provides no reasons for its determination, *see id.*[17]

[17] In this case, Mackenzie contends that "because the trial court did not provide an analysis of the evidence supporting the verdict in question," this court should examine the evidence *de novo.* Best, on the other hand, believes we should show deference to the trial court's determination by "view[ing] the evidence in the light most favorable to that award of $0."

¶ 78. Mackenzie first argues that "undisputed" evidence established that Best's conduct caused him compensatory damages and, therefore, that the trial court erred in refusing to change the jury's answer. Mackenzie maintains that while Best disputed *the amount* of damages, she tacitly conceded a certified public accountant's testimony that her conduct caused damages of at least $4,771,056, if not the $9,101,222 the accountant said was Mackenzie's full loss of earning capacity as a result of his termination. Best responds that "Mackenzie's assertion that it was undisputed that [she] caused [him] damages in the amount of $4,771,056 is absurd." We agree.

¶ 79. As Best argues, the defendants contested *all* the damages throughout the trial, "strenuously disput[ing] both Mackenzie's damages evidence and Mackenzie's attempt to attribute *any* of those damages to *any* of the defendants' conduct." (Emphases added.) In fact, the only evidence to which Mackenzie refers to support his contention is out of context and, as a result, completely misleading. Mackenzie cites the testimony of Fredric Kolb, the economics professor the defense retained to review the analysis prepared by Ricky Steiner, the accountant Mackenzie retained to calculate his economic damages. Mackenzie contends that Professor Kolb challenged only the *amount* of damages calculated by Mr. Steiner. But what Mackenzie fails to

Regardless of whether the trial court's brief comments constitute "an analysis of the evidence," we need not resolve the parties' dispute over our standard of review. The trial court's comments provide little guidance and, in any event, we have reviewed the entire record so that, in effect, we have analyzed the evidence as if being presented with "a matter of first impression." *See Cords v. Anderson*, 80 Wis. 2d 525, 553, 259 N.W.2d 672 (1977).

acknowledge, in his brief to this court, is that Professor Kolb essentially disclaimed any knowledge of the underlying merits of any of Mackenzie's claims or theories. Professor Kolb merely evaluated Mr. Steiner's analysis and, indeed, prefaced his testimony by explaining that he "accept[ed], for purposes of [his (Kolb's)] evaluation, the assumptions contained within the plaintiff's damages analysis."[18]

¶ 80. Thus, we must move on to consider whether a reasonable basis exists for the jury's determination that while Best's conduct warranted punitive damages, her conduct caused Mackenzie no compensatory damages. Carefully comparing Mackenzie's and Best's theories, we see a reasonable basis.

¶ 81. Mackenzie argues, alternatively, that the compensatory/punitive damage verdicts either cannot reasonably be reconciled, or that, when reconciled, they support the punitive damages award. In support of the latter alternative, Mackenzie suggests a plausible possibility: the jury, having already awarded compensatory damages on Mackenzie's misrepresentation claims against Miller Brewing and Smith, might have simply concluded that it need not award additional compensatory damages against Best in order to award punitive damages against her. Thus, Mackenzie emphasizes, the jury might have believed it was following the trial court's instructions:

[18] Professor Kolb also testified that he was asked to review Mr. Steiner's reports "for the purpose of checking for the quality of the logic, checking for mathematical mistakes, and for the implications of some of the assumptions that were made." Ultimately, Professor Kolb challenged Mr. Steiner's logic and use of double counting methodology.

> In answering the damage questions, be careful not to include or duplicate in any answer amounts included in any other answer made by you. . . . Punitive damages may be awarded in addition to compensatory damages if you find that the defendant's conduct was outrageous. . . . *You may not, however, award punitive damages unless you have awarded compensatory damages.*

(Emphasis added.) The instructions, Mackenzie correctly notes, did not delineate whether the compensatory damages the jury had "awarded" had to have been pegged specifically to Best. He argues, therefore, that the jury must have concluded that it could award him punitive damages against Best based on its compensatory damages verdicts against Miller Brewing and Smith.

¶ 82. While possible, Mackenzie's theory is not the only plausible one. The jury, for all we know, might have viewed things differently. Reasonably, it could have distinguished Best's conduct from Miller Brewing's response to her complaint. Indeed, such a distinction would have been consistent with *Mackenzie's* original claim—that although his conduct was inappropriate, Best had not really felt as offended as she claimed, and she and Miller Brewing overreacted. After all, as we have observed, Mackenzie's cause of action against Best was not that she had falsely accused him of having inappropriate conversations about the *Seinfeld* episode, but rather, that she "fraudulently misrepresented . . . that she felt harassed" by their conversations. In the jury's estimation, therefore, any resulting *compensatory* damages may have come from Miller Brewing's conduct in terminating Mackenzie, not from Best's conduct in reporting the incident.

¶ 83. Was the jury drawing this distinction? We do not know. Clearly, the trial court could have refined the instructions or submitted clarifying questions. *See Westfall v. Kottke*, 110 Wis. 2d 86, 97, 328 N.W.2d 481 (1983) (" 'When a jury returns a verdict containing errors, inconsistencies or lack of compliance with the directions of the special verdict and instructions, the trial court may direct the jury's attention generally to the prospective error and require it to deliberate further to correct any errors that may exist.' ") (quoting John A. Decker & John R. Decker, *Special Verdict Formulation in Wisconsin*, 60 MARQ. L. REV. 201, 272 (1977)). But Mackenzie's insistence that a new trial on compensatory damages is required, based on *Westfall's* declaration that "when a verdict is inconsistent, such verdict, if not timely remedied by reconsideration by the jury, must result in a new trial," *id.* at 98, misses the mark.

¶ 84. In *Westfall*, the supreme court held that "the inconsistency on the face of the verdict was *irreconcilable*." *Id.* at 100 (emphasis added). Here, by contrast, as we explained, verdicts that may at first seem inconsistent can be reconciled. In *Westfall*, counsel moved for a new trial based, *inter alia*, on the inconsistency of the verdicts. *See id.* at 92. Here, by contrast, although Mackenzie seeks a new trial on compensatory damages now, he did not do so in the trial court. *See id.* at 99 (Waiver of claims arising out of allegedly inconsistent verdicts may be appropriate where "the waiver does not result in a change of the prevailing party as found by the jury."). We also note that Mackenzie did not object to the instructions which, he now asserts, formed the basis for what he contends were the jury's inconsistent verdicts. *See* WIS. STAT. § 805.13(3) (1997–98) ("Counsel may object to the

proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the [instruction and verdict] conference constitutes a waiver of any error in the proposed instructions or verdict.").

¶ 85. We need not determine what the jury was thinking. It is enough to recognize that the jury reasonably could have returned verdicts finding that Best's conduct justified a punitive award, but that she did not cause Mackenzie any compensatory damages. If so, the jury's punitive damages award against Best, while legally superfluous, was not logically inconsistent with its compensatory damages verdict. *See Frey v. Alldata Corp.*, 895 F. Supp. 221, 224 (E.D. Wis. 1995) (although jury's answer "assessing punitive damages after finding zero compensatory damages . . . is superfluous, it is legally impossible, not logically inconsistent"). Accordingly, we conclude that the trial court did not err in refusing to change the jury's answer and, further, that because the verdicts can be reconciled, no new trial on compensatory damages is required.

B. COMPENSATORY DAMAGES / PUNITIVE DAMAGES

¶ 86. Mackenzie argues that, even in the absence of a compensatory damage award specifically denominated against Best, the punitive damage award against her can be upheld because of the compensatory damages awards against Miller Brewing and Smith. In support of his argument, Mackenzie has offered several intriguing theories based on the interplay of the evidence and claims in this case. By reversing the compensatory damages awards against Miller Brewing and Smith, however, we have effectively removed much of the foundation for Mackenzie's theories.

¶ 87. In *Tucker*, the supreme court, in a 4–3 decision, declared:

> We hold today that punitive damages are not available where there has been no "award" of actual damages. . . . An "award" represents a remedy recoverable in accordance with an order for judgment. It is not enough that actual damages may have been "suffered" or "sustained" in order for punitive damages to be awarded. This holding is firmly rooted in long-standing principles of Wisconsin law.

*Tucker*, 142 Wis. 2d at 439 (footnote omitted). The supreme court has carved out only one possible exception, though even that involved an award of punitive damages accompanying other "nominal" damages. *See Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 613–14, 621, 563 N.W.2d 154 (1997) (concluding that "consider[ing] the individual and societal interests implicated when an intentional trespass to land occurs," nominal damages "may support a punitive damage award").

¶ 88. Mackenzie argues that the reasoning of *Jacque* should extend to this case because the "individual and societal interests" just as strongly support the availability of punitive damages for a false complaint of sexual harassment. After all, he contends, "[b]oth individuals and society have significant interest in deterring employees from making allegations of sexual harassment with the intent of interfering with the accused's contractual relation with his or her employer." We conclude, however, that notwithstanding society's obvious interest in deterring false complaints of sexual harassment, Mackenzie's argument is overwhelmed by competing considerations.

¶ 89. Nothing in *Tucker* or *Jacque* offers the slightest indication that false complaints of sexual harassment should form the basis for an exception to the "firmly rooted" principle precluding punitive damages in the absence of compensatory damages. *See Tucker*, 142 Wis. 2d at 439. While Mackenzie, relying on *Jacque*, argues that such an exception would be justified by the substantial consequences attending such a false complaint, *Jacque*, if it suggests anything, suggests otherwise.

¶ 90. In *Jacque*, the supreme court concentrated very specifically on the special nature of the harm caused by trespass to land—a harm, obviously, wholly distinguishable from that resulting from a false complaint of sexual harassment. *See Jacque*, 209 Wis. 2d at 615–22. The supreme court also focused on the societal response to trespass to land, commenting that "[p]unitive damages have the effect of bringing to punishment types of conduct that, though oppressive and hurtful to the individual, almost invariably go unpunished by the public prosecutor." *Id.* at 620. Thus, the supreme court clearly was influenced by the fact that, generally, trespass to land, despite the significant harm it causes, is not prosecuted and, when it is (as it was in that case), the penalty is modest. *See id.*

¶ 91. What, then, does *Jacque* imply about Mackenzie's theory? It may imply very little. Drawing any meaningful conclusions from a comparison between *Jacque* and the instant case is difficult, of course, because a trespass to land and a false complaint of sexual harassment have almost nothing in common. Nevertheless, *Jacque* may be very instructive because the supreme court, in analyzing whether to carve out an exception to *Tucker*, was concerned not only with the nature of the harm, but also with *the nature of*

*society's response.* While Mackenzie, understandably, would have us focus on the serious harm that can come from a false complaint, the supreme court, it seems, would have us also analyze how society responds. When we do so, we can only conclude that *Jacque's* rationale does not extend to produce an exception to *Tucker* for false complaints of sexual harassment.

¶ 92. Lawful use of land and trespass to land are almost always easy to distinguish. Clearly, our laws seek to encourage the former and discourage the latter. Moreover, deterring and punishing trespass certainly will not discourage lawful land use. True and false complaints of sexual harassment, on the other hand, may be very difficult to distinguish. And while our society would always want to discourage false complaints, our laws have not located the certain means to do so without improperly discouraging citizens from bringing true complaints. As the United States Equal Employment Opportunity Commission emphasizes in its *amicus curiae* brief, American society, in a succession of legislative actions and judicial decisions reflecting a growing sensitivity to the powerful disincentives to complain of sexual harassment, has been providing progressively greater protection for those who do. And although no Wisconsin statute or case law has established an *absolute* privilege shielding complainants from lawsuits such as Mackenzie's, a recent decision, establishing a *conditional* privilege, echoes the EEOC's concerns.

¶ 93. In *Wolf v. F & M Banks*, 193 Wis. 2d 439, 534 N.W.2d 877 (Ct. App. 1995), in which a bank president brought claims, including tortious interference with contract, against two employees as a result of their respective roles in bringing a sexual harassment

complaint against him, this court declared that the plaintiff's claim, to survive the "conditional privilege" accompanying such a complaint, would have to be supported by evidence of "ill will or an improper motive towards the plaintiff." *See id.* at 462. Further, we emphasized: "To not recognize the conditional privilege in such a setting would frustrate an employer's attempt to investigate and correct employee-related problems in the workplace. It would also chill an employee's willingness to freely and openly discuss the matter in such a setting." *Id.* at 460–61; *see also Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 921–22, 440 N.W.2d 548 (1989) ("[C]ertain conduct which would otherwise be actionable may escape liability because the defendant is acting in furtherance of some interest of societal importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff."); *Liebe*, 98 Wis. 2d at 15 ("Not all intentional interference with contract is actionable."). Even viewed most sympathetically, Mackenzie's evidence falls short of establishing Best's "ill will or an improper motive."

¶ 94. As the EEOC reminds us, "Mackenzie's real gripe is not with Best, who simply reported an incident of sexual harassment (truthfully or otherwise), but with Miller, which terminated Mackenzie's employment." In this regard, it is important to keep in mind, once again, that although Mackenzie disputed certain details of Best's account of their conversations about the *Seinfeld* episode, he did not disagree with her essential story. And although Mackenzie maintained that Best had maliciously feigned umbrage and subsequently embellished her allegations, his assertion that "Best intentionally and without justification caused [him] to be escorted forever from the Miller premises" is hyperbolic.

¶ 95. The undisputed evidence established that Best confronted Mackenzie about her displeasure over their *Seinfeld* conversations, and that she discussed the matter with her superior who, in turn, insisted that it be referred to the Miller officials responsible for reviewing such incidents. The undisputed evidence also established, however, that Best said she did not intend to file a sexual harassment complaint, and that she attempted to dissuade Miller officials from pursuing the matter. No evidence supports Mackenzie's assertion that Best intentionally caused his discharge.[19] With no proof of "ill will" or "improper motive," Mackenzie's proof fails to cross the *Wolf* threshold. *See Wolf*, 193 Wis. 2d at 462.

¶ 96. Finally, even if the jury reasonably inferred that Best was untruthful—both in her account of her reaction to the *Seinfeld* conversations and in her other allegations involving Mackenzie—the jury still awarded Mackenzie $0 compensatory damages against her. Without compensatory damages, the punitive damages award could not stand. And, in light of society's interest in encouraging complainants to report

[19] Mackenzie maintains, nonetheless, that "[t]he jury could reasonably infer that Best wanted [him] fired so she could continue reporting directly to her friend, [David] Goulet, as opposed to Mackenzie, to whom it was anticipated she would report [when some anticipated transfers would occur]." But in support of that assertion, Mackenzie provides only three record references—two to testimony of Best and one to testimony of Goulet—*none* of which supports his theory, and two of which flatly dispute it. While it is true that the jury could have doubted or disbelieved that testimony, Mackenzie still is stuck without any support in the record for his contentions about Best's motive.

sexual harassment, we do not carve out an exception to the *Tucker* preclusion of punitive damages in the absence of compensatory damages. Accordingly, on this aspect of the cross-appeal, we affirm the trial court's dismissal of Mackenzie's claim.

## II. WRONGFUL TERMINATION

¶ 97. In his fourth cause of action, Mackenzie claimed that Miller Brewing wrongfully terminated his employment by discharging him "in response to the informal complaint/charge of Best that she felt harassed by [his] March 19, 1993 conversation with her regarding the Seinfeld program," even though "Miller did not believe that [Best's complaint] . . . was cause to terminate [him]." He claimed that Miller Brewing terminated him because "Miller believed that the termination . . . was necessary to avoid or limit Miller from future liability for complaints/charges of harassment." Granting partial summary judgment, the trial court dismissed with prejudice Mackenzie's wrongful termination claim. Mackenzie cross-appeals the dismissal of his claim.

¶ 98. Summary judgment standards and methodology have been stated in countless cases and need not be repeated here. *See Caulfield v. Caulfield*, 183 Wis. 2d 83, 91, 515 N.W.2d 278 (Ct. App. 1994). Our review of a grant of summary judgment is *de novo. See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

¶ 99. Mackenzie concedes that his wrongful termination cause of action is not "currently recognized by Wisconsin law." In fact, even in his complaint, Mackenzie candidly stated that "[t]his cause of action is supported by a good faith argument for an extension,

modification and/or reversal of existing law." We, however, are not at liberty to extend, modify, or reverse existing law as Mackenzie desires, particularly in light of the supreme court's decision in *Bushko*.

¶ 100. In *Bushko*, the plaintiff, an employee of Miller Brewing Company, claimed that Miller fired him for complaining "about Miller's policies in three areas—plant safety, hazardous wastes and 'honesty.'" *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 138, 396 N.W.2d 167 (1986). The trial court granted summary judgment to Miller Brewing, but we reversed in an unpublished decision, concluding, *inter alia*, that terminating an employee—even an at-will employee—for exercising free speech in support of employee safety contravened public policy as declared in *Brockmeyer*. *See Bushko*, 134 Wis. 2d at 140. The supreme court reversed, explaining:

> In *Brockmeyer*, 113 Wis. 2d at 572–73, 335 N.W.2d 834, we held:
>
>> "We have concluded that in the interests of employees, employers and the public, a narrow public policy exception should be adopted in Wisconsin. Accordingly, we hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law."
>
> However, we went on to state with specificity in *Brockmeyer* as follows:
>
>> "We intend to recognize an existing limited public policy exception. *An employer may not require an employee to violate a constitutional or statutory provi-*

71

*sion with impunity. If an employee refuses to act in an unlawful manner, the employer would be violating public policy by terminating the employee for such behavior."* Id. at 573, 335 N.W.2d 834. (Emphasis added.)

The court of appeals incorrectly held that activity merely consistent with a public policy provides a basis for a wrongful discharge cause of action. *Brockmeyer* requires that the discharge be for refusing a command to violate a public policy as established by a statutory or constitutional provision.

*Bushko*, 134 Wis. 2d at 140–41. Additionally, the supreme court explained that "[t]he court of appeals incorrectly made the employer's intent in the discharge a material fact in stating why the motion for summary judgment should not have been granted." *Id.* at 141.

¶ 101. In *Bushko*, the supreme court concluded that, under *Brockmeyer*, in order to survive summary judgment, an employee must "allege and attest that he was discharged for refusing to violate a constitutional or statutory provision." *Id.; cf. Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 15–16, 483 N.W.2d 211 (1992) ("Where a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge for an employee's refusal to violate that public policy is actionable."). In *Hausman*, the supreme court broadened the exception to also encompass situations where an employee is terminated because he or she complies with a "fundamental and well-defined" legal duty, *Hausman*, 214 Wis. 2d at 669 (noting that "public policy of protecting nursing home residents from abuse is fundamental and well-defined," and holding that where employee has affirmative legal duty "to prevent

abuse or neglect of nursing home residents and the employee fulfills that obligation by reporting the abuse, an employer's termination of employment for fulfillment of the legal obligation exposes the employer to a wrongful termination action").

¶ 102. Mackenzie did not "allege [or] attest that he was discharged for refusing to violate a constitutional or statutory provision," *see Bushko*, 134 Wis. 2d at 141, or that he was terminated for complying with a "fundamental and well-defined" legal duty, *see Hausman*, 214 Wis. 2d at 669. Thus, regardless of Miller Brewing's alleged intent, and regardless of the public policy considerations Mackenzie invokes, the trial court correctly granted Miller Brewing partial summary judgment dismissing Mackenzie's wrongful termination claim. Accordingly, on this aspect of Mackenzie's cross-appeal, we also affirm.

*By the Court.*—Judgment reversed; orders affirmed in part and reversed in part.

¶ 103. FINE, J. *(concurring).* Despite the length of the trial, the submissions to this court, and the lead opinion, and despite the amount of money involved, this is a simple case. I join in the decision announced by the lead opinion, and in those parts of its rationale consistent with what follows.

¶ 104. 1. *Mackenzie's intentional-misrepresentation tort claim against Miller.* Jerold L. Mackenzie has no intentional-misrepresentation tort claim against Miller Brewing Company. *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 579 N.W.2d 217 (1998), recognizes that an employee complaining about something arising out of or related to the

employer/employee relationship is relegated to whatever contract rights there might be between the parties—the employer has no tort duty to the employee in connection with the employer/employee relationship. *See id.*, 219 Wis. 2d at 107–108, 579 N.W.2d at 220–221. Stated another way, an at-will employee, which Mackenzie concededly was, may not use tort-duty as a surrogate contract. *See ibid.*; *see also Atkinson v. Everbrite, Inc.*, 224 Wis. 2d 724, 728–730, 592 N.W.2d 299, 301–302 (Ct. App. 1999). Accordingly, I agree that we must reverse the judgment founded upon Mackenzie's claim in tort.

¶ 105. 2. *Mackenzie's tort claim against Smith.* I join in the lead opinion's decision and analysis of this issue.

¶ 106. 3. *Mackenzie's tort claim against Best.* I join in the lead opinion's decision and analysis of this issue.

¶ 107. 4. *Mackenzie's wrongful-termination claim against Miller.* I join in the lead opinion's decision and analysis of this issue.

¶ 108. WEDEMEYER, P.J. *(concurring in part; dissenting in part)*. I, respectfully dissent in part for reasons procedural, substantive and fundamental from the lead opinion reversing the jury. I concur with the lead opinion's conclusion that Mackenzie failed to provide any evidence of improper conduct that would constitute tortious interference with his prospective contract with Miller and, even if he had, Smith's conduct was privileged as a matter of law. I also concur with paragraph 8 of the lead opinion, wherein we affirm the partial summary judgment dismissal of

Mackenzie's claim based on wrongful termination. Now, I set forth my reasons for dissenting.

*A. Sufficiency of the Evidence to Support Intentional Misrepresentation Claim.*

¶ 109. I first address the procedural aspect of my dissent. When reviewing a sufficiency of evidence issue post-verdict, we shall not reverse a trial court's decision on the issue unless the court is clearly wrong in assessing the evidence. A trial court is "clearly wrong" when there is no credible evidence supporting the jury's finding or in overturning a jury verdict which is supported by any credible evidence. *See Weiss v. United Fire & Cas.*, 197 Wis. 2d 365, 389–90, 541 N.W.2d 753 (1995). Deference to the jury's verdict is even greater when it has been approved by the trial court, which is the procedural posture in which we find this appeal. *See Staehler v. Beuthin*, 206 Wis. 2d 610, 617, 557 N.W.2d 487 (Ct. App. 1996). When applying this standard, we focus on the record evidence and any reasonable inferences that may be drawn therefrom, not on arguments of counsel or their briefs, as helpful as these items may be. We now apply this standard of review to the record.

¶ 110. Among the many issues raised on this appeal and cross-appeal, Miller and Smith contend that the evidence is insufficient to prove any of the essential elements of intentional misrepresentation.[1] The lead opinion agrees with this contention. Therefore, a review of the basis for the lead opinion, as compared to the content of the total record, is in order.

---

[1] Because the lead opinion adequately sets forth the elements of intentional misrepresentation and the burden of proof, I eschew unnecessary repetition.

75

Whether there is support in the record for the jury's verdict, finding that intentional misrepresentation occurred, will depend, in large part, on the existence of any credible evidence to support reasonable inferences to uphold the verdict.

¶ 111. The lead opinion proffers four reasons to support its conclusion that there was no false representation of fact: (1) the record provides absolutely no evidence that Mackenzie's position was downgraded in 1987; (2) an admission by Smith to Mackenzie in 1992 that Glickert's hiring by Miller, the subsequent transfer of personnel from his supervision to Glickert, and the assumption of some of Mackenzie's former responsibilities caused his downgrading, was an ambiguous statement; (3) Mackenzie's grade-level status was unaffected by the reorganization; and (4) Mackenzie's belief that his position may have been downgraded due to altered responsibilities by the reorganization in 1987, does not constitute "any" evidence that Smith lied to him in 1987 or concealed anything from him in 1989. Each posited basis will be addressed in turn.

¶ 112. The first basis for the lead opinion is the absence of any evidence that Mackenzie's employment position was downgraded in 1987. Among the instructions given to the jury was the definition of the evidence that they could consider. It consisted of the testimony of the witnesses given in court, both on direct and cross-examination, deposition testimony presented during trial, and exhibits received in the trial record. The court also instructed the jury that it was not necessary that every fact in this trial be proved directly by a witness or an exhibit. A fact may be proved indirectly by other facts or circumstances from which it usually and reasonably follows according to human experience. We can presume the jury followed

these instructions. In question one of the verdict, the jury was asked to answer, "Did Robert L. Smith make a representation of fact at any time, that Jerold J. Mackenzie's grade level was not affected by the 1987 reorganization?" The inquiry was open-ended timewise; i.e., did Smith *at any time* represent a fact that Mackenzie's grade level was not affected by the 1987 reorganization.

¶ 113. The lead opinion claims that the only evidence which suggests that Smith's response was false was Smith's answer to a written interrogatory cited during trial wherein Smith stated that he informed Mackenzie that his position had been grandfathered, implying that the downgrading had actually occurred in 1987. At trial, however, Smith claimed that he was mistaken in his dates and the date should have been 1989, which is when the grandfathering issue came into play. In the lead opinion's view, this corrected the discrepancy. Maybe. Maybe not.

¶ 114. The jury heard from Mackenzie that, in 1987, Smith stopped by Mackenzie's office to inform him that Glickert had been hired and what his responsibilities would be. This reorganizational development concerned Mackenzie and he asked Smith: "Does that affect my grade level? It's half my area. Is this going to get me downgraded?" Mackenzie testified that Smith responded:

> [I]t's not going to affect you at all. Don't worry about it. . . . you're very important to the company. You're making a good contribution. I really want you to help Mr. Glickert learn the Miller ways, to get comfortable at Miller. You know the ropes. They're a little different over at Budweiser probably, so I want you to spend some time with him and help him. . . . quite frankly . . . there's a lot of things that

77

[need to] be done in distributor services and you haven't had the attention or the time to focus on that. So you'll have time to focus on that now.

¶ 115. Smith had no specific recollection of the 1987 meeting, but presumed he would have met with Mackenzie and explained to him the impact of the reorganization. There is more in the record than a mere implication as suggested by the lead opinion. Under cross-examination, Smith responded to the following questions:

Q Did you have more than one meeting or discussion with Mr. Mackenzie regarding the fact that he had been grandfathered?

I know we talked about the period of time around '87.
But now we're up to 92. Do you recall more than one meeting with Mr. Mackenzie regarding grandfather status?
And your answer was, I don't recall a specific meeting or meeting dates.
Question: Do you recall more than one meeting?
Answer: Again, if I spoke to him, at this point in time, I'm presuming it was likely I spoke to him back in 1987, at the time of that organization change. In both instances my practice would be to tell him the impact on his Grade Level.

Contrary to the lead opinion's contention, there is additional testimony in the record to place at issue precisely what occurred in 1987 or in 1992. It was then for the jury to decide who should be believed and whose testimony should be accorded more probative value. The

jury's verdict supplies the answer. There is a reasonable basis in the record for the answer.

¶ 116. The second basis for the lead opinion's conclusion that there was a lack of proof is its belief that an admission by Smith to Mackenzie in 1992 that Glickert's hiring by Miller, and the sequential transfer of personnel from his supervision to Glickert's, and the assumption of some of Mackenzie's former responsibilities caused his downgrading, was an ambiguous statement. The relevant testimony which Mackenzie argues supports his claim, but which the majority debunks, reads:

A Mr. Smith told me that this [downgrading] was due to when Mr. Glickert came in to his area, and they transferred a large number of my people to his responsibility. That that caused my rating to downgraded.

Q And that would have been what year?

A 1987.

¶ 117. The lead opinion totally discounts this testimony maintaining that the word "that" is ambiguous because it could either refer to 1987 and to when the downgrading occurred or, to when Glickert came into Smith's area bringing about the reorganization that led to the downgrading in 1989. Assuming ambiguity, the lead opinion then concludes that the latter reading is the most logical and supported by the evidence. If one assumes the testimony was ambiguous, the majority committed procedural error by arrogating to itself the role of the finder of fact, here the jury. Once "ambiguity" is present, if at all, it is the task of the jury to determine which inference it deems appropriate to draw from the testimony presented. *See RTE Corp. v.*

*Maryland Cas. Co.*, 74 Wis. 2d 614, 621, 247 N.W.2d 171 (1976).

¶ 118. The third basis for the lead opinion's conclusion that the evidence was *insufficient* is the fact that, although the position that Mackenzie occupied was downgraded to level 13, he retained all the benefits of level 14. This conclusion is not entirely correct, and is misleading as borne out by the record. The testimony clearly reflects that Mackenzie made no secret about his career goal at Miller. Pure and simple, he aspired to be a management director. He had slowly but consistently progressed to a grade level 14 employee. He was one level below his goal.[2] Directors were level 15 and above. A level 14 employee was entitled to the pay range of the status, executive dining privileges, first-class air travel, and eligibility for stock options in the parent company, Philip Morris. Even though the grandfathering practice permitted Mackenzie to retain his salary and most perks when Smith approved the level 13 downgrade, Mackenzie was removed from the grade level which, in the natural progression of events, would have allowed him to achieve a directorship. No individual who had ever been downgraded from a level 14 or higher had ever returned to his or her original grade. On August 17, 1992, Mackenzie was informed by an inter-office correspondence that "you were reclassified and 'grandfathered' at the grade level 14 in a job evaluated at grade level 13 due to an organizational realignment and/or restructuring." The same day, Mackenzie spoke to his supervisor, Zielinski, about the

---

[2] This factor is further supported by the fact that had Mackenzie been given the position recommended by the Boston Consulting Group task force, he would have been elevated to level 15 and a directorship.

content of the letter. The questions and answers during Zielinski's testimony at trial reveal the following:

Q Did not Jerry Mackenzie then come and talk to you and was very upset about learning the information that was contained in the letter . . .?

A Yes, he was.

. . . .

Q Sure. Because one of the things Mr. Mackenzie told you, when he said he was really upset, was that — . . . Mackenzie said to you was he was upset about being grandfathered, that the goal he had established for himself as director was now farther apart than he realized . . . and that he felt he was not aware that he had been grandfathered, and that an opportunity to perhaps make a choice in his career earlier had not been allowed to him. That's what he told you.

A Those are the sentiments he expressed, yes.

. . . .

Q He told you that he lost an opportunity to make a choice in his career because it had not been allowed to him since he didn't know about it, right?

A Yes.

Q He told you that he was now farther away from his goal of being a director because now his position was a 13.

A Correct.

Q And that nobody had told him he had been grandfathered.

A Yes.

¶ 119. On August 19, 1992, Smith summoned Mackenzie to his office to explain the notice Mackenzie had received on August 17, 1992. Smith informed Mackenzie that effective January 1, 1993, he would no longer be grandfathered. It is for this reason that the jury heard the following testimony from Mackenzie:

Q Now, in 1987 you testified that you approached Mr. Smith about how the Glickert coming was going to affect you.

A Yes, I did.

Q Had you been told that your position was going to be reevaluated, just reevaluated for a determination of an appropriate Grade Level, what would you have done if you had been told that?

A I would have looked at my options for employment someplace else.

Q Why?

A Because if they were going to downgrade me in my position, that's a demotion. And I wouldn't be in the front running, or in the running really at all for a promotion, so I would be — I would be stuck where I was. I would be sealed off. So I would look somewhere else to be able to get my career back on track.

¶ 120. Thus, the jury had before it evidence of the total effect of his job reclassification, not just the narrow view as portrayed by the lead opinion of the same pay and perks. From this evidence, it is not unreasonable for the jury to conclude that the job classification position Mackenzie occupied had, in fact, been downgraded, even though he retained some of the advantages of the previous level position.

¶ 121. Lastly, the lead opinion concludes that Mackenzie's belief that his position may have been downgraded due to altered responsibilities by the reorganization in 1987, does not constitute "any" evidence that Smith lied to him in 1987 or concealed anything from him in 1989. I disagree.

¶ 122. Mackenzie presented his evidence of intentional misrepresentation to the jury. Whether he expressed what happened to him and the sequence of events in terms of a "belief" or otherwise is not relevant. The judgment of the jury on the misrepresentation claim, to a large extent, depended upon how the jury assessed Mackenzie's or Smith's credibility, and their respective versions of what happened between 1987 and 1992. The essence of Mackenzie's misrepresentation claim can be encapsulated in his testimony about his meeting with Smith in August 1992, after he had been informed about his status:

A I learned that what I had believed back in 1987, that I was not going to be affected, and for all of that time up until 1992 that I'd been betrayed, I'd been lied to.

. . . .

A Because he told me it would not affect me. It would not affect your Grade Level. It's not going to affect you, Jerry, you're making a contribution, don't worry. He's my boss. He's a vice-president.

¶ 123. Smith, on the other hand, on cross-examination, displayed a very elusive memory. Although Mackenzie was one of only five managers who reported directly to Smith, and whose work product reflected upon Smith's own performance evaluation, Smith

could not remember the number or content of meetings that related, by his own admission, to matters of vital personal concern to one of his managers. In addition, he found himself caught in a contradiction as to what he earlier admitted telling Mackenzie but, at trial, he backtracked and claimed he was in error. Mackenzie claimed that in 1989 he was never told about his reclassification, and did not learn about it until August 17, 1992.

¶ 124. Smith, although he could not remember the specifics of any meeting with Mackenzie, nevertheless insisted that Mackenzie was in error in claiming he had never been informed in 1989. The first question on the verdict that the jury had to answer was not time-specific as to when a misrepresentation of fact may have occurred. Because the jury was instructed that it need not ignore matters of its common knowledge and its observations and experiences in the affairs of life under the evidence, the affirmative answer to the first question is readily understandable. The second question whether the "representation was untrue" was a credibility call. From the above recitation, it was not unreasonable if the jury did not believe Smith and chose rather to draw inferences from the record that reasonably could be drawn; i.e., that Mackenzie's account of what happened was more acceptable than that of Smith. Smith's statement to Mackenzie in 1987 "it's [the reorganization] not going to affect you at all" has a broad sweep to it and is all encompassing. Even the lead opinion admits that Mackenzie's responsibilities were affected when Glickert was hired. It is not too attenuated to reasonably infer that reduced responsibilities shall call for reevaluation, reclassification and downgrading. Further, the jury heard testimony from both the chief executive officer of Miller, John MacDon-

ough, and Mackenzie's last immediate supervisor, Zielinski, that Mackenzie should have been told about the downgrading.[3] There is sufficient evidence in the record to support the jury determination.

¶ 125. The lead opinion concludes that, even if Smith misinformed Mackenzie in 1987 or failed to inform him in 1989, no evidence was offered that Smith did so in an effort to induce him to continue his employment with Miller. According to the lead opinion, Mackenzie maintains that the jury could draw the common sense conclusion that a demotion would prompt a reasonable person in his position to look for work elsewhere, and that Smith was concerned about losing well-qualified individuals, thereby supplying the reasonably inferred motivation for intent to deceive for work continuation.

---

[3] MacDonough testified via deposition, which was read to the jury:

Q As the chief executive officer of Miller Brewing Company, do you believe that an employee is entitled to know when his position is downgraded by the company?

. . . .

A Yes, I would want them to know.

Zielinski testified:

Q And if . . . he [Mackenzie] was your direct report . . . you would have called him in and told him [that he had been downgraded], correct?

A Possibility, yes.

Q Well, in your deposition you didn't say possibility, you would have said it was your obligation to do so, and you would have done it.

A I believe I would have, yes.

Q Yes. Because it was your obligation.

A Personally the way I manage, yes.

¶ 126. Mackenzie was extremely skilled in applying computer technology to the sales marketing and distribution of Miller products. He conceived of and created a computerized mapping project for distributors. He co-developed a project called "AIMS" that involved the use of hand-held computers to conduct market surveys of Miller distributors. His work on this project was the basis for being nominated to receive the prestigious Chairman of the Board of Philip Morris award. The long hours he devoted to his assignments were well-noted.

¶ 127. In annual evaluations from 1982 to 1990, he was rated "exceeds performance." His job performance enhanced Smith's performance evaluation. Even after his employment had been terminated, he was retained as a consultant, and Miller refused to allow him to work for a Canadian competitor. As mentioned earlier, Smith considered Mackenzie a very important contributor to the brewery. With all of this evidence before it, plus Smith's questionable performance as a credible witness, it is not unreasonable for the jury to infer the existence of the intent to deceive.

¶ 128. The lead opinion also sets forth three circumstances to demonstrate contradictions in Mackenzie's claim that the misrepresentation was made with intent to deceive. I quibble not with this analysis. But again, the error of the lead opinion's way is stepping into the shoes of the finder of fact. It was for the jury to resolve any apparent contradictions. It did so. An appeals court ought not retry the evidence, as I believe the lead opinion has done. *See Holz v. Busy Bees Contracting, Inc.*, 223 Wis. 2d 598, 600, 589 N.W.2d 633 (Ct. App. 1998). The author of the lead opinion writes that Mackenzie offered no evidence that he relied to his detriment on any misrepresentation. Ear-

lier in this dissent, there is set forth excerpts of the evidence demonstrating what Smith told Mackenzie after he specifically asked what impact Glickert's arrival and the reorganization would have on his status. "It's not going to affect you at all. Don't worry about it," responded Smith. Smith tells him he is important to the company. He is making a contribution. Smith was his boss, and a vice-president. What more does a person need, in order to reasonably rely, other than the affirmative assurances of his vice-president. With these words of comfort, Mackenzie did not act unreasonably when other people under him were being reclassified because he had been given the assurances of his boss: "Don't worry!" As observed by the trial court, Mackenzie was "lulled" into believing he was on an upward mobility tract. Mackenzie's executive search expert supplied evidence regarding the effect the passage of five years had on his marketability. Even his last immediate supervisor, Zielinski, was not aware that the position Mackenzie occupied had been downgraded until 1992.

¶ 129. The lead opinion concludes that Mackenzie offered "nothing" to prove misrepresentation damages. Mackenzie, on the other hand, argues that, based upon the evidence, the jury reasonably could have decided: (1) being downgraded was the "kiss of death" at Miller for promotion purposes; (2) had he truly known he was downgraded, he would have had the opportunity to pursue his upward career with another company, and would have earned upward to $6,000,000 until retirement age; and (3) he lost that opportunity because of his age at the time he was finally told the truth.

¶ 130. Mackenzie presented evidence that he was not told the truth about his employment status

from 1987 through August 1992. There is evidence in the record that had he been told the truth about information he specifically requested from Smith, he would have known his future advancement was foreclosed and he would have sought other opportunities. There is evidence in the record that no one who had been downgraded at Miller ever returned to, or was promoted beyond, his or her original grade. There is evidence that Mackenzie was unable to secure employment, even though he hired an executive recruiter and was searching for a job. There is evidence as to what his salary and benefits would be at levels 13, 14 and 17. There is expert testimony that, based upon his age range between the years 1987–1992 and his executive level, his job marketability was imperiled by not being able to pursue other career opportunities, and that he suffered a complete earning capacity loss which would not have occurred had he been told the truth. Contrary to the lead opinion's efforts to recast the evidence, there is more than enough evidence from which a jury could reasonably conclude that had Mackenzie been given a truthful answer to his inquiry in light of his superior's knowledge of his career goals, he would have sought employment elsewhere and would have earned the equivalent compensation, testified to by experts, that he would reasonably have earned at Miller had he stayed until retirement.

*B. Substantive Claim: Whether an Intentional Misrepresentation Claim Exists.*

¶ 131. I now address the substantive reasons for my dissent. The lead opinion concludes that the *Tatge* case "precludes an employee's tort claim against an employer for alleged intentional misrepresentation that allegedly induced *continuation* of employment."

Relying on public policy, the lead opinion also concludes that no duty to disclose was required here. I disagree with both conclusions.

¶ 132. In essence, the author of the lead opinion writes that Miller had no independent duty to refrain from engaging in intentional misrepresentation. I cannot agree. *Tatge* addressed a negligent misrepresentation claim that was inextricably tied to termination. *Tatge* did not go so far as to abolish the tort of intentional misrepresentation for an employee. *Tatge* was not an intentional misrepresentation case. Rather, it is a very narrow decision declaring that a breach of contract case was not actionable in tort. It should not be interpreted to preclude a continuation of employment claim based on intentional misrepresentation, such as was presented here. Contrary to the lead opinion's rationale as to how Mackenzie tried and argued the case, it did not relate to a misrepresentation made with respect to his termination. There is no inextricable tie between the intentional misrepresentation and the performance of the contract. Mackenzie did not have to establish a duty independent of the performance of the contract because his claim did not relate to misrepresentations made with respect to his termination. *See Landwehr v. Citizens Trust Co.*, 10 Wis. 2d 716, 723, 329 N.W.2d 411 (1983). The misrepresentations he complains about related to inducing him to continue his employment. *Tatge* does not specifically address this issue, nor can I conclude we should read *Tatge* to preclude this type of claim. In fact, the lead opinion admits and cites cases across the country that support Mackenzie's claim. *See* Majority at ¶¶ 30–31 & n.6. For example, New York "has long held that an action for fraudulent misrepresentation, independently pleaded, can constitute a cause of action which

may be pleaded in addition to, or as an alternative to, an action for breach of contract." *Shaitelman v. Phoenix Mut. Life Ins. Co.*, 517 F. Supp. 21, 22 (S.D. N.Y. 1980).

¶ 133. These cases have recognized that an employer who lies to an employee to induce the employee to continue with the company cannot escape the liability that may be associated with intentional deceit. Cases dealing with the unilateral volunteering of corporate strategy and insider information are distinct from affirmatively being untruthful about the answer to a specific request. This case is not about a duty to disclose. It is about the absolute duty not to lie![4] It may, however, entail a duty to disclose facts upon which the requester may rely, after a specific request is made. *See* WIS JI—CIVIL 2401 ("A duty to speak may arise when information is asked for."). Having concluded that *Tatge* does not bar the claim presented here, I also am persuaded by the reasoning espoused in several of the cases the majority dismisses. For example, in *Marketing West, Inc. v. Sanyo Fisher, Corp.*, 7 Cal. Rptr. 2d 859 (Ct. App. 1992), the court reiterated that when a employer decides to speak, " 'either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must

---

[4] I also note that the trial court ruled that Miller had waived its right to contest "duty to disclose." The trial court pointed out that Miller stipulated that it had a duty to disclose. The lead opinion disagrees with the trial court's conclusion in this regard. But having reviewed the trial court's ruling on this issue, where it points out the pertinent discussion between the parties on the subject, I would defer to the trial court's decision as to this matter.

make a full and fair disclosure.' " *Id.* at 865 (citation omitted).

¶ 134. It is undisputed that under Wisconsin case law Smith and Miller can be found liable for intentional misrepresentation to induce one to work. How then can we conclude that the sanction disappears when the employee steps over the doorstep of the workplace? There is no legal basis to support this position. The cases supporting Mackenzie's claim recognize that fraudulent inducement to continue employment "is separate from a claim based on termination of employment which is not available to at-will employees." *Franz v. Iolab, Inc.*, 801 F. Supp. 1537, 1542 (E.D. La. 1992). Although the at-will employment doctrine adhered to in this state permits employers to dismiss employees for any reason, this doctrine does not, and cannot, permit an employer to lie and deceive an employee to continue employment. The at-will employment doctrine does not bar a claim for intentional misrepresentation against an employer. *See Offshore Petroleum Divers, Inc. v. Cromp*, 952 S.W.2d 954 (Tex. Ct. App. 1997). Here, Smith knew Mackenzie's career goals and, when specifically questioned as to whether the reorganization would affect him (Mackenzie), Smith affirmatively represented that it would not.

¶ 135. The appellants and the lead opinion fail to address the question that goes to the heart of the employer-employee relationship and its stability: does the employer have a right to do a wrong? They cite no cases that allow an employer to engage in intentional misrepresentation with impunity. This case involved a fact-specific request, not a request to divulge every detail of the boardroom. An employer can withhold any information it wants as long as it is not done fraudulently. When Mackenzie questioned Smith, Smith

could have refused to answer. Once Smith spoke, he assumed the duty to speak truthfully. As the WELA brief succinctly points out, there is no basis in law, equity or public policy for this court to endorse the granting of employers the license to lie. Without exception, employees are expected to be honest in their work performance and there is no reason that a different standard should only apply to employers. Truthfulness and integrity in an employee-employer relationship form a foundation that allow all to thrive.

¶ 136. Here, the jury found that Mackenzie proved the elements of intentional misrepresentation: that Smith made a representation of fact that was untrue, Smith knew it was untrue, and made it with the intent to deceive and to induce Mackenzie to stay employed at Miller to Mackenzie's detriment.

¶ 137. The lead opinion further concludes that public policy precludes allowing Mackenzie to maintain the intentional misrepresentation claim. The lead opinion provides five reasons to reject Mackenzie's claim: (1) market forces are a good enough deterrent; (2) at-will relationship will retain its desired flexibility; (3) duty to disclose is not simple; (4) the action should be in contract and not in tort; and (5) there is no sensible just stopping point. I disagree with the lead opinion's analysis in each respect.

¶ 138. Market Forces. The lead opinion suggests that market forces will be sufficient to deter fraudulent practices. I cannot agree. As evidenced by Mackenzie's case, market forces did not preclude the deceit that the jury found was committed here.

¶ 139. Flexibility of At-Will Employment. The lead opinion suggests that preclusion of tort claims in the employment context will result in the at-will employment relationship retaining the flexibility that

is so advantageous to both employers and employees. Recognizing that an employee may present an intentional misrepresentation claim to a jury in an attempt to prove that the employer lied to him to prevent him from seeking employment elsewhere, will not interfere with the flexibility of employment at-will. These types of claims are few and far between, as evidenced by the limited number of cases reported across the country. Intentional misrepresentation actions are fact-specific and difficult to prove.

¶ 140. Complexity of Duty to Disclose. The lead opinion concludes that recognizing this cause of action would create difficulties in defining what an employer may be required to disclose. This is an insufficient policy reason to foreclose Mackenzie's claim. This type of complex question involves issues that lawyers, who accept cases, and courts, who preside over cases, have been deciding day after day. The fact scenarios cited in the lead opinion as hypothesized by HRMA and WMC do not constitute sufficient reason to foreclose the claim altogether. The fact scenarios presented are distinct from the very specific facts the jury was presented with here.

¶ 141. Contract not Tort. The lead opinion suggests that foreclosing this claim will not permit an employer to commit fraudulent acts because employees still have a contract remedy. Unless an employee has a contract with a term that requires the employer to be truthful in response to an inquiry about the employee's job status, if asked, and prohibits an employer from lying in order to prevent the employee from seeking employment elsewhere, it is hard to imagine contract law providing an adequate remedy for the fact scenario presented to the jury in Mackenzie's case.

¶ 142. <u>No Sensible Stopping Point</u>. Finally, the lead opinion suggests that recognizing this claim would result in "employers and employees forever guessing at the limits of their responsibility and potential liability." I cannot agree that "no sensible stopping point" public policy precludes Mackenzie's claim. Again, as evidenced by the relatively limited reported case law across the country addressing this issue, specifically in the states where this claim has been recognized, there has not been a stampede to the courthouse steps. The bottom line is that, in this case, the jury found that Smith, when directly asked by Mackenzie whether his status was affected by the reorganization, lied. He told Mackenzie that he would not be affected at all, that Miller needed him, he was a valued employee, etc. When an employee directly asks the question of an employer, and the employer chooses to answer the question, fairness and adherence to fundamental principles of society demand that the employer provide the employee with a truthful answer to the question.

## C. *Fundamental Reasons.*

¶ 143. Lastly, I conclude that there are very fundamental reasons to reject the majority's reversal of the jury's intentional misrepresentation finding. That Miller and Smith may have had the greater right under the "at-will" doctrine to discharge Mackenzie, for any reason or no reason, does not entail the lesser right to lie to him because one has a fundamental duty not to lie.[5]

¶ 144. We, as humans, are social beings by nature and destined to communicate with our fellow

---

[5] JOHN H. GARVEY, WHAT ARE FREEDOMS FOR? 195–206 (Harv. Univ. Press 1996).

human beings. One of the means that we possess for communicating is the faculty of speech. Speech is an instrument by which a mind is brought into contact with another mind, by which the thoughts of one are conveyed to another. To use speech to convey a thought of the mind, which is not truly a thought of the mind, is to use the faculty of speech contrary to its primary purpose. Therefore, the right use of speech, as determined by its very nature, is to make known the thoughts of the mind to signify what one thinks is true. When one intentionally uses words or actions which belie one's inner convictions, one misuses the faculty of speech. To do so, is then to signify what is not true. It is the absence of conformity between the mind and speech which constitutes a lie.

¶ 145. More germane to the issue before us, an intentional misrepresentation which the jury found to have occurred, is a lie because Smith's speech and subsequent actions did not conform to the true thoughts of his mind, and were performed without justification. He had a fundamental duty not to lie or intentionally misrepresent because it was contrary to his nature. From a societal standpoint, Smith's actions have a pernicious effect because they tend to destroy mutual confidence and weaken the bonds fundamental to an orderly and peaceful society.[6] Whether the Kantian "Categorical Imperative" or a general Thomistic orientation (both of which served as partial foundation stones in the development of our common law and constitutional tradition) are a basis for analysis, it is fundamentally wrong to lie without a justification.[7]

---

[6] Jos. Sullivan, Special Ethics 17–28 (Holy Cross College Press 1949).

[7] Hadley Arkes, First Things, An Inquiry into the First Principles of Morals and Justice 85–115 (Princeton Univ.

¶ 146. On the surface, this appeal may seemingly concern itself with whether a cause of action was appropriately pleaded but, in reality, it focuses upon a more fundamental value necessarily contemplated by our Wisconsin Constitution. Article I, section 22 acknowledges: "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and *by frequent recurrence to fundamental principles*." WIS. CONST. art. I, sec. 22 (emphasis added). To even dare suggest, much less conclude, that the wrong of intentional misrepresentation should be excused, qualified, or suspended from sanction because of the circumstances in which it is found to have been executed; i.e., it occurred in an employment setting, is the apogee of moral relativism or utilitarianism. Such a resolution ought not be condoned.

¶ 147. There is a time or times for every fundamental principle forming a basis for our society to be acknowledged or reinforced. This appeal presents that occasion. Our state has a well-respected tradition for preserving fundamental individual and societal rights, euphemistic rationalizations notwithstanding. Time and again, our judicial system has risen to the occasion. To resolve this appeal on the basis of situational morality, as perhaps unconsciously proposed by the majority, would be a disservice to our citizens, our state and our society.

Press 1986); LEIBEL, READINGS IN ETHICS 529–565 (Loyola Univ. Press 1926); PETER KREEFT, A REFUTATION OF MORAL RELATIVISM 101–123 (Ignatius Press 1999).

¶ 148. In sum, I would affirm the jury's verdict on the intentional misrepresentation claim, but reverse on the interference with contract claim.[8]

[8] In so concluding, it would be necessary for me to address the issues raised regarding punitive damages. Having reviewed the trial court's decision in this regard, I agree with the analysis set forth and would affirm the judgment in that regard. The trial court concluded that there was credible evidence to support the punitive damage award against Miller. The trial court made this determination after having the opportunity to hear and see the witnesses and other evidence. It concluded that there was sufficient evidence to allow the jury to conclude that Miller's conduct was outrageous. I adopt the reasoning of the trial court.